FONTAINBLEAU HOTEL CORP. and Babs, Inc., Appellants,

v.

Florence Lustig CROSSMAN, Appellee.

Florence Lustig CROSSMAN, Appellee,

v.

FONTAINBLEAU HOTEL CORP. and Babs, Inc., Appellants.

No. 20083.

United States Court of Appeals Fifth Circuit.

Oct. 11, 1963.

938

Richard P. Kenney, Williams, Salomon, Kenney & Lindzon, Miami, Fla., for Fontainbleau Hotel Corp. Cromwell A. Anderson, Miami, Fla., for Babs, Inc. Smathers & Thompson, Miami, Fla., of counsel.

Robert C. Ward, Ward & Ward, Miami, Fla., for Florence Lustig Crossman.

Before CAMERON and WISDOM, Circuit Judges, and DeVANE, District Judge.

WISDOM, Circuit Judge.

This action by the owner of a dress shop for enforcement of an agreement, allegedly giving the plaintiff an "exclusive" ("exclusive" rights to sell certain articles) of ladies' wearing apparel in the Fontainbleau Hotel in Miami Beach, Florida, is the third round of litigation between Florence Lustig Crossman and Fontainbleau Hotel Corporation. Babs, Inc., another tenant in the Hotel, a co-defendant in the case, was not a party to the earlier litigation.

During the construction of the Fontainbleau in early 1955, negotiations between the Hotel's representatives and Mrs. Crossman resulted in her opening a dress shop in the lower lobby. A lease was drawn giving Mrs. Crossman a five-year leasehold with an option to renew for an additional five years. It provided that

"the lessee will *exclusively* have and use the premises only for the conduct therein and therefrom of a store for the retail sale of evening gowns, cocktail dresses, women's streetwear, women's suits and coats, women's sports and cruise wear and fur trimmed sweaters, blouses and skirts with matching tops."

The lease was never signed by any agent of the hotel corporation and hence would have been unenforceable under the Florida Statute of Frauds, but for the doctrine of part performance. This Court held that the lease would be binding under that doctrine if it could be

shown that the lessee had taken possession, paid rent, and made substantial expenditures for improvements, Crossman v. Fontainebleau Hotel Corp., 5 Cir., 1959, 273 F.2d 720. On remand, the district court found that the plaintiff met this burden. We affirmed. Fontainebleau Hotel Corp. v. Crossman, 5 Cir., 1961, 286 F.2d 926. Florence Lustig Crossman, a/k/a Florence Lustig, trading and doing business as Florence Lustig, therefore, had a valid contract of lease and was entitled to exercise the option to renew.

Shortly after Mrs. Crossman's shop, known as "Florence Lustig," began doing business at the Hotel, a dispute arose with another shop, Babs, Inc., which also sold ladies wear in the lower lobby of the Hotel. Babs complained that Lustig was selling sportswear and swimsuits, items which Babs sold; Lustig complained that Babs was invading its "exclusive" field of high-priced women's apparel. At a meeting on May 8, 1955, representatives of Babs, the Hotel, and "Florence Lustig" resolved this dispute. A letter dated May 9, 1955, signed by the Babs' representative and by Mrs. Crossman as "Florence Lustig, Pres.—Florence Lustig of N.Y. Inc.", reduced the agreement to writing. The May 9 letter provided:

"*The Babs shop cannot sell*

"Any dress which is one-piece, regardless of whether the dress has matching jackets or sweaters.
"Suits, except those made in leather and suede.

"Fur trimmed sweaters.

"Any two or three-piece matching separates if the combined price exceeds $69.95 retail.

"*The Babs shop can sell*

"Skirts and sweaters at any price providing the sweaters have no matching material as trimming to match the skirts. However, if they so match they cannot be sold for more than $69.95 retail, and this

pertains regardless of whether it is two, three or four pieces.

"It is also understood and agreed that the Florence Lustig Shop can sell such items as they are selling as of this date including all the items presently sold by Babs, Inc., but definitely not to conflict with any of our other shops."

Babs and the Hotel executed a written lease which incorporated the terms of the May 9 agreement and which ran until October 31, 1959. After that date Babs continued to occupy the premises at an increased rental in return for the Hotel's consent to allow Babs to sell previously prohibited items.

Lustig brought this suit against the Hotel Corporation and Babs, Inc., for damages and an injunction to protect her exclusive right to sell high-priced ladies wear in the Hotel. After a trial before judge and jury, the trial judge ruled, as a matter of law, that the lease gave Mrs. Crossman an exclusive privilege to sell the listed items. In defining damages, the court held that the Hotel would be liable to Mrs. Crossman for the difference in value of the leasehold interest with and without the "exclusive" provision, if it knowingly permitted another tenant to sell goods in competition with Mrs. Crossman. The trial judge directed a verdict for the Hotel on the issue of violations before November 1, 1959, the date when Babs' first lease expired, on the ground that there was not sufficient evidence to hold the Hotel to account for damages during that period. Also, he ruled that the May 9, 1959, agreement was not binding on Babs *after* its original lease expired on November 1, 1959, and that the proper measure of damages for any violations *before* November 1, 1959, of the May 9 agreement would be the loss of profits suffered by Lustig.

The jury returned verdicts of $9,000 against Babs and $18,000 against the Fontainbleau. In answering several

interrogatories submitted to it,[1] the jury showed that it believed the Hotel knew or should have known about Babs' violations between March 9, 1956, and October 31, 1959, and that Lustig had suffered $6,000 damages by reason of the Hotel's failure to observe its obligations in that period; these damages were not awarded, because of the directed verdict for the Hotel on that issue. In addition, the court enjoined the Hotel from allowing anyone on its premises other than Lustig to sell those items which the May 9 agreement forbade Babs to sell.

All three parties appealed. Lustig contends the court erred: (1) in directing a verdict on the issue of the Hotel's liability before November 1, 1959, and (2) in restricting the terms of the injunction to require that the Hotel recognize an exclusive right in Lustig to sell only those items mentioned in the May 9 agreement rather than the broader list of items included in the unsigned lease agreement performed by Lustig. Babs contends the court erred: (1) in ruling that Mrs. Crossman, as an individual, could sue on the May 9 agreement executed by Mrs. Crossman as president of her corporation; (2) in holding that the May 9 agreement was a valid contract; (3) in finding that Mrs. Crossman had shown a loss of profits as a result of Babs' alleged breach; and (4) in not setting aside the verdict for lack of evidence showing the extent of the losses suffered. The Hotel contends that the court erred: (1) in allowing Lustig to enforce any exclusive right in the lease against the Hotel, because Lustig's contract with Babs constituted a novation freeing the Hotel from any obligations under the original lease; (2) in finding that Lustig had exclusive rights under the lease; (3) in admitting certain expert testimony; and (4) in the court's questioning of some of Lustig's witnesses on the issue of damages.

## I.

A. The first problem is that of the identity of Mrs. Crossman and her corporation, "Florence Lustig of New York, Inc." We have met this issue before. In the second appeal of the former action, when Mrs. Crossman individually brought suit to enforce the lease which in terms referred to the corporation as lessee, we said:

"The testimony and documentary evidence show that the parties were not concerned with the corporate entity or name of the lessee. The Hotel looked to Florence Lustig Crossman, the individual, to operate the dress shop and since March 11, 1955, she has occupied the premises, paid the rent, and followed the terms of the * * * lease. The contracts and correspondence refer to Florence Lustig, Inc., Florence Lustig of New York, Inc., Florence Lustig, and Florence Lustig Crossman. The district court found that the parties treated Mrs. Crossman and "Florence Lustig of New York, Inc.", as "inseparable and interchangeable"; that the hotel did not care under what name or entity she operated the dress shop as long as she operated it." 286 F.2d at 929–930.

Similarly, in this situation, there is no showing that Babs ever relied on the fact that the May 9 agreement was signed

---

1. Although the court had directed a verdict in favor of the Hotel and against Lustig, the court submitted four interrogatories to the jury:

 1. To determine whether or not the evidence showed that Babs had violated the terms of the agreement of May 9, 1955, which the jury answered "yes".

 2. The amount of damages sustained by Lustig as a result of such violation,

which the jury answered "$9,000.-00".

 3. Whether or not the jury felt that the Hotel knew or should have known of the violations by Babs up to October 31, 1959, to which the jury answered "yes", and

 4. What damages, if any, had been sustained by Lustig by reason of the breach of the lease covenants by Fontainbleau, which the jury established at "$6,000.00."

by Mrs. Crossman in her corporate posture, nor was there any evidence that Babs even considered it was dealing with a corporation rather than Mrs. Crossman as an individual. The wording of the May 9 agreement itself shows that the parties considered Mrs. Crossman, the Florence Lustig shop, and the corporation to be legally indistinguishable. Although the agreement was signed as Florence Lustig, president of the corporation, the body of the agreement states first that Mr. and Mrs. Crossman were representing "Florence Lustig" and then that the "Florence Lustig shop can sell" certain items; the corporation is not mentioned in the body of the agreement.

■ Babs, Inc., asserts that if either it or the Hotel had sought to enforce the May 9 undertaking against Lustig, the individual defendant would have been protected by the corporate shield of Florence Lustig, Inc. This case, however, presents a typical situation in which the corporate veil would have been pierced, and the dominant shareholder held responsible. Cf. Riesen v. Maryland Cas. Co., 1943, 153 Fla. 205, 14 So.2d 197.[2] The corporation was never in possession of the premises, it never engaged actively in any business venture, and it did not even have a bank account. See 286 F.2d 930. The interest of the corporation and the shareholder were identical; the corporation was the alter ego of the individual. See Mayo v. Pioneer Bank & Trust Co., 5 Cir., 1959, 297 F.2d 392; Third Ave. Co. v. Keely, 111 Fla. 46, 149 So. 30. The cases relied upon by Babs sustain the broad proposition that in the absence of an assignment one not in privity cannot sue upon a contract, but none of the cases deals with a situation comparable to the one we find here. We think that the relationship between Mrs. Crossman and her corporation and the recognition of it by both parties distinguish this case from those following the general rule.

## II.

■ Taking the other events in question chronologically, we turn to the lease between Lustig and the Hotel to consider whether Lustig has the exclusive right she claims.[3] The Hotel challenges the trial judge's instructions to the jury that the phrase "the Lessee will exclusively have and use the premises only for the conduct * * * of a store * * · * " gives Lustig an exclusive right to sell the items of clothing there listed. The basis of this attack is that Lustig claimed "an exclusive" on anything in the ladies' wear line which she wished to sell, whereas it was established without contradiction that there were a number of other ladies' wear shops operating at the same time in the Hotel under a clear understanding of all involved as to what each would sell. The Hotel argues that since she plainly did not have an exclusive on everything, she did not have an exclusive on anything.

In the first place, the May 9 agreement did not purport to change the terms of the lease in which the Hotel granted Lustig an exclusive. It speaks only of the restrictions on Babs.[4] Second, the

2. In addition, Florida courts have disregarded the corporate entity and treated the shareholders as the real parties in interest in order to benefit the shareholders. See, e. g., Kay v. Key West Dev. Co., Fla., 1954, 72 So.2d 786.

3. Parenthetically we note that this lease is one of the rights upon which this suit is founded. The Hotel argues that Lustig sued only on the May 9th agreement and the lease agreement between Babs and the Hotel. This interpretation results from a misreading of the amended complaint which states that damages are sought for the "breach of lease agreements (not a single agreement as the

Hotel quotes it) of BABS, INC. and the FONTAINBLEAU." This phrase plainly refers to the undertakings of Babs in its lease with the Hotel plus those of the Hotel in its lease with Lustig.

4. The passage was taken from the cross-examination of Mrs. Crossman by Mr. Kenney:

Q. Then on May 9, 1955, when this agreement was evolved, which at least listed certain things that either you or she could sell, you could sell everything she could sell but she could only sell certain items; is that correct?

A. Yes.

lease identifies the classes of item to which Lustig's exclusive refers. The fact that Lustig might be free to sell other things would not in any way change the application of the provision in question to the articles there listed.

Other considerations also compel the conclusion that the trial judge correctly instructed the jury that as a matter of law the provision gave Lustig an exclusive. It is very clear that from the first, the Fontainbleau's policy was to rent only to non-competing tenants. The Hotel admitted this. It is a common hotel policy. Thus, the May 9 agreement was drafted to provide that while Lustig could continue to sell items also sold by Babs, which had no exclusive provision in its lease, it could not sell items conflicting with other shops in the Hotel. Another important fact is that the parties by their own conduct from the beginning treated the lease as giving an exclusive. The negotiations to compromise the dispute between Babs and Lustig produced an accord that Lustig was to have right to sell certain things without competition from Babs, but Babs was given no corresponding right. The Hotel was represented in these negotiations. Then, although the Hotel was not bound by the May 9 agreement, as it contended and the court below so ruled, it placed the restrictions of that agreement in its lease to Babs, in spite of the fact that such a restriction undoubtedly made the lease less attractive to Babs and resulted in a lower rental. We infer that the Hotel was acting on the assumption that it had already granted an exclusive to Lustig which it had to protect in its lease to Babs.

Finally, the Babs lease contained no term similar to the "exclusive" in Lustig's lease. This negatives any inference that the word "exclusively" is simply included in the Hotel's leases which state that the lessor enters the lease on the strength of the lessee's personal responsibility and business ability, to prevent the lessee from turning over the management of the business to any one else. Both leases were prefaced with that statement, but only the Lustig lease contained the reference to "exclusively."

Fontainebleau Hotel Corp. v. Kaplan, Fla.Dist.Ct.App., 1959, 108 So.2d 503, does not sustain the Hotel's position. In that case a lease was held not to confer an exclusive right on the tenant. But we observe an important distinction between the leases: Kaplan's lease did not contain the word "exclusively".

### III.

██ A. Coming now to the issue of consideration for Babs' promise in the May 9 agreement not to sell those items on which Lustig had an exclusive, we find that this question is solved by the resolution of the previous one. We have determined that Lustig had the right not to have anyone else in the Hotel sell those articles on which she had an exclusive. In the agreement with Babs, however, Lustig gave up this exclusive right and Babs received the right to sell "skirts and sweaters at any price providing the sweaters have no matching material as trimming to match the skirts" and to sell even "matching material" for less than $69.95 retail. Sufficient consideration to support a contract based on a promise exists if there is a detriment to the promisee. Mangus v. Present, Fla., 1961, 135 So.2d 417, 418. And there need not be a benefit to the person making the promise. Lake Sarasota, Inc. v. Pan American Sur. Co., Fla.Dist.Ct.App., 1962, 140 So.2d 139, 142. We hold that the May 9 agreement was supported by valuable consideration and was binding on both parties.

██ B. We find that the May 9 agreement did not constitute a novation freeing the Hotel from the obligations incurred under the lease to Lustig. A novation is the substitution of a new contract between the same parties with the intention of extinguishing the old contract; the original obligor is freed from his obligation, but his contractual right must be intentionally relinquished, waived, or replaced by another right or by another obligor under the same right. See Murphy v. Green, 1931, 102 Fla. 102,

135 So. 531, 534. There is no indication whatsoever that Babs' promise was accepted as a substitute for the Hotel's or in discharge of the Hotel's obligation. The compromise agreement between Babs and Lustig dealt only with a narrow area and a limited time. It was made to settle a dispute with a stranger to the original contract and not to substitute that party as obligor under the contract. The Hotel's argument overlooks the existence of other tenants in its building whom it was bound to prevent from encroaching on Lustig's area. If the Hotel's novation theory were to be accepted, it would mean that Babs would have to be responsible for policing all the other tenants in the Hotel, a result which is totally unreasonable and obviously was never intended.

### IV.

 A. Lustig asserts that the trial court erred in not submitting to the jury the question whether the Hotel had knowledge of Babs' violations between May 9, 1955, and October 31, 1959. The president of the Hotel testified that he had no complaints from Lustig about the conduct of the Babs shop. Mrs. Crossman, however, testified that she sent a telegram to the Hotel and spoke with Mr. Novack and Mr. Margulies, another managing officer of the Hotel, complaining about Babs' selling Lustig's exclusive items. Mr. Margulies did not report any complaints. There is in evidence a letter dated March 9, 1956, addressed to Mr. Novack, stating:

"Harold and I have complained about Babs selling dresses and other items in violation of our mutual agreements. You have promised to look into the matter and Mr. Margulies has told us that he will take it up with Mr. Katz.

"In the meantime, nothing has happened. Babs continues to sell dresses and other forbidden items to our great financial loss.

"This is most distasteful, but I must insist that this practice be stopped, and that I hold you responsible."

Taking this evidence in the light most favorable to Lustig and giving full effect to the reasonable inferences which could be derived from it, we think the jury could properly have found for Lustig on this material issue. See Dawson v. McWilliams, 5 Cir.1960, 146 F.2d 38. "[I]f the evidence is of such a character that reasonable men in an impartial exercise of their judgment may reach different conclusions, then the case should be submitted to the jury." Swift & Co. v. Morgan & Sturdivant, 5 Cir., 1954, 214 F.2d 115. Although it formed no basis of our decision on this point, we note that the jury in reply to the interrogatories believed Lustig.

We hold it was error to direct a verdict for the Hotel as to damages for Babs' violations before October 31, 1959.

On this point, the case is remanded for action by the trial court consistent with this finding.

 B. The assertions of error in the judge's questioning of the plaintiff's witnesses on the issue of damage and in the submission of the issues of damages on allegedly insufficient evidence may be dealt with briefly. After reviewing the record, we find that the judge's questions were not prejudicial; the witnesses were testifying about damages in a situation where there is no certain measure. The trial judge's efforts were directed to clarifying the testimony for the benefit of the jury. Similarly, there was no error in submitting the questions of injury to the jury merely because it was incapable of certain measurement. The testimony which was introduced was apparently the best available. On the issue of diminution of rental value, the experts who testified were found by the judge to be qualified in the field of leasing and gave the jury the full benefit of the method they used to calculate the damage done. No experts on the other side were offered to contravene these witnesses. Again, on loss of profits, there was ample evidence from plaintiff's witnesses as to the operation of Lustig's business to allow the jury to make a reasonable esti-

mate of the profits that were lost as a result of Babs' encroachments.

C. As a final point, we hold that the terms of the injunction too narrowly restricted Lustig's exclusive rights. The trial court found that the May 9 agreement was not binding on the Babs shop after November 1, 1959, yet it entered an injunction phrased in terms of that agreement. The result would be that Babs would not be bound by the agreement, and could sell anything; the Hotel would not be bound; Lustig would be stuck with it, although the agreement between Babs and Lustig in no way affected the rights which Lustig secured under the lease from the Hotel. When Lustig exercised the option to renew, the renewed lease carried with it the same exclusive grant to Lustig and the consequent restriction on the Hotel set forth in the original lease. The injunction should reflect that exclusive and that restriction. In view of the history of this litigation, we think it is reasonable that the judgment enjoin the Hotel from violating the lease.

Affirmed in part, reversed in part, and remanded.