**NATIONAL EQUIPMENT LEASING CORPORATION, Appellant,**

**v.**

**H. M. FARRIER, Trustee for Traders Compress Company, Inc. and its wholly-owned subsidiary, Pioneer Products, Inc., Appellee.**

**No. 73-1187.**

United States Court of Appeals, Tenth Circuit.

Argued and Submitted Aug. 15, 1973.

Decided Sept. 25, 1973.

As Amended on Denial of Rehearing Nov. 28, 1973.

John A. Gilliam, Dallas, Tex. (Reynolds & Ridings, Oklahoma City, Okl., and Thompson, Knight, Simmons & Bullion, Dallas, Tex. on the brief), for appellant.

Robin P. Hartmann, Dallas, Tex. (Louis J. Weber, Jr., Dallas, Tex., and John R. Couch, Oklahoma City, Okl., on the brief), for appellee.

Before HILL, BARNES* and SETH, Circuit Judges.

* Honorable Stanley N. Barnes, Senior Judge of the Ninth Circuit, sitting by designation.

BARNES, Circuit Judge:

This appeal arises from the decision and partial summary judgment of the United States District Court for the Western District of Oklahoma, upon a claim for damages under an equipment leasing agreement. Defendant-appellee, H. M. Farrier, is trustee in bankruptcy for Traders Compress Company, Inc. (herein Traders), and its wholly-owned subsidiary, Pioneer Products, Inc.

Plaintiff-appellant, National Equipment Leasing Corporation (herein National), is a Delaware Corporation with its principal place of business in Pittsburgh, Pennsylvania. On April 28, 1969, National entered into an Equipment Lease Agreement with North America Corporation (herein "old" North America); a Texas corporation with its principal place of business in Dallas, Texas. *Prior* to the execution of the lease agreement, "old" North America entered into an agreement and plan of merger with Traders. On June 16, 1969, *subsequent* to the lease agreement, Traders acquired all of the assets and *assumed all the liabilities* of "old" North America, and "old" North America was dissolved. On July 1, 1969, Argosy Corporation, a wholly-owned subsidiary of Traders, effected a change of name to North America Corporation. Thereafter, all leasing arrangements and business between National and the Traders' companies was conducted through the officers of "new" North America Corporation.[1]

On February 1, 1970, all obligations pursuant to the lease agreement came into default. On April 12, 1971, National instituted an action for damages pursuant to a liquidated damages clause in the lease agreement against Traders in the 193rd Judicial District Court of Dallas County, Texas. Prior to the disposition of this action, an involuntary petition under Chapter X of the Bankruptcy Act was filed against Traders in the United States district court. National filed its claim in the district court for $1,266,582.35 against Traders; the claim not disposed of in the state court action. The district court ruled that those lease obligations assumed by "old" North America were recoverable from Traders; but those obligations assumed by the "new" North America were not. Ten of the twelve lease arrangements made pursuant to the lease agreement were made with "new" North America. Our jurisdiction rests in 28 U.S.C. § 1291.

The Equipment Lease Agreement is at the center of this dispute. It is Schedule I to Exhibit A attached to the claim filed in bankruptcy. By the terms of the agreement, National agreed to lease, and North America agreed to hire "units" of farm sprinkler equipment to

I. CHRONOLOGY:

1) December 5, 1968—Agreement and plan of merger made between "old" North America Corporation and Traders Compress Company, Inc.

2) April 28, 1969—Equipment Lease Agreement executed between "old" North America and National Equipment Leasing Corporation.

3) April 30, 1969—Schedules NA-1 and NA-2 executed by Robert Poston, President of "old" North America and National.

4) June 16, 1969—Merger between "old" North America and Traders, and Traders assumed all obligation to National.

5) July 1, 1969—Argosy Corporation effected a change of name to North America Corporation ("new" North America).

6) February 1, 1970—Obligations pursuant to all schedules came into default.

7) March 25, 1970—National allegedly first learned that "old" North America had been dissolved. Traders disputes this.

8) April 12, 1971—National instituted an action for damages pursuant to a liquidated damages clause in the Lease Agreement against Traders in 193rd Judicial District Court of Dallas County, Texas. (State Court).

9) May 12, 1972—Involuntary petition under Chapter X of the Bankruptcy Act filed against Traders in United States District Court (prior to disposition of the state court action.) National filed claim in amount of $1,266,582.35.

10) January 23, 1973—Judgment entered for National and against Traders, in the United States District Court, allowing National recovery under Schedules NA-1 and NA-2 in sum of $34,946.83 and denying recovery in Schedules NA-3 through NA-12.

be sub-let through North America to individual farmers. North America did not personally use the equipment. The arrangement is best described by appellee:

> "North America Corporation would seek farmers to whom they could lease farm equipment and machinery. After locating prospects, North America Corporation would refer a file concerning each prospect to National for credit check and approval. Upon approval by National, North America . . . would execute a sublease agreement between itself and the farmer and would at that time attach an additional schedule to the Equipment Lease Agreement. That schedule would describe the farmer and establish the relationship between National and North America as principal lessor and lessee of that equipment." (Appellee's Brief at 4.)

The first two obligations for which the district court held Traders liable (Schedules NA–1 and NA–2), were executed by "old" North America through its President, Robert Poston. Schedules NA–3 through and including NA–12 were executed by "new" North America through its President, E. T. Beynon. The lease agreement provided that the schedules made pursuant to the agreement would " . . . be attached hereto and to become a part hereof as same are executed from time to time by the parties hereto." (Vol. II, Record, Schedule 1, Par. 1.) The district court held:

> "That only schedules which were executed by the same parties as those who had executed the master lease agreement could, under the terms of the master lease agreement, constitute valid schedules to be attached and incorporated into the master lease agreement." (Findings of Fact and Conclusions of Law, at 2, Par. 6, Vol. 1, Record, at 77.)

Since Beynon and "new" North America were not of the original parties to the agreement, the court reasoned that Traders, as the parent of "new" North America, could not be obligated on the schedules executed after the dissolution of "old" North America.

Traders admits that it:

> " . . . did assume the base lease agreement by merger, became a party to the agreement, and likewise became a party to and obligor under the base agreement, including all schedules 'executed from time to time by the parties hereto.' It is undisputed that 'the parties hereto' as identified in the base lease agreement —which National rightly insists must govern all subsequent undertakings pursuant to it—are National and old North America Corporation. Upon merger, those parties hereto became National and Traders, and Traders became liable for any schedules executed by National and Traders pursuant to the base lease agreement." (Appellee's Brief at 5.)

However, Traders argues, neither Traders nor "old" North America executed Schedules NA–3 through NA–12; only "new" North America was a party with National to those schedules, and Traders cannot be liable for its subsidiary's obligations in the absence of a showing of fraud or instrumentality relationship. This argument rests upon a finding that each schedule constituted a separate contract apart from the original lease agreement of April 28, 1969.

National argues that each schedule was a part of the original lease agreement: "adjuncts or exhibits to the main instrument." (Appellant's Brief at 13.) Traders has admitted that it became a party to the original base agreement through its acquisition of "old" North America. In this context, National argues Traders delegated the performance of its obligation under the original agreement to "new" North America; and that in the absence of a novation of the original agreement, Traders' obligation to National was not discharged. National correctly notes that, as a minimum requirement, novation must be preceded by mutual agree-

ment by the original and substituted parties. There is no proof, nor is it argued by Traders, that an agreement for a novation occurred.

From these opposing arguments and the decision of the district court, we must decide, as a matter of law, the effect of the foregoing events. The broad question is whether Traders was liable for Schedules NA–3 through and including NA–12. The narrow question is whether the schedules constituted separate contracts between National and "new" North America, or whether they were amendments to the original agreement upon which Traders is admittedly liable.

■ Each schedule, Schedules NA–1 through NA–12, were two pages in length; the first page describing the property leased, and the second primarily assigning all rental · payments due North America to National. Each was stated to be "subject to the terms and conditions of the lease agreement and appendices." In addition, said schedules contained a clause (similar to that found in Schedule NA–12), that the schedule was "to be attached to and become part of Lease Agreement dated April 28, 1969." (Schedules at 2, Par. 1.)

Traders predicates its claim that it was not a party to Schedules NA–3 through NA–12 (that is, that such schedules were *separate* contracts), on the fact that they were executed by E. T. Beynon, President of "new" North America; and that Traders never gave its consent to "new" North America to enter into new contracts, nor to bind Traders under the original agreement to which "new" North America was not a party. We find it unnecessary to consider whether Traders gave "new" North America authority to execute the schedules, because we hold that the schedules were part of the original agreement to which Traders was obli-

gated. Although Traders has argued that the schedules constituted separate contracts Traders has not established that they were separate.

The following considerations are in our opinion determinative:

1.) Each Schedule looked to the original agreement and each stated it was "to become" a part of the original agreement. The original agreement provided that it would "be construed in accordance with the laws of the State of Pennsylvania." (Section XIII of the Equipment Lease Agreement (Vol. II, Record, Schedule 1.)).[2]

In Neville v. Scott, 182 Pa.Super. 448, 127 A.2d 755 (1956), the Supreme Court of Pennsylvaina stated that where contractual instruments, by their terms, are mutually inclusive such that one instrument has no meaning without the other, the instruments "will be read together, and each will be construed with reference to the other." Neville v. Scott, *supra*, 127 A.2d at 757.

" 'If contracting parties choose, they may express their agreement in one or more writings and, in such circumstances, the several documents are to be interpreted together, each one contributing (to the extent of its worth) to the ascertainment of the true intent of the parties.' " *Id.*, quoting from International Milling Co. v. Hachmeister, Inc., 380 Pa. 407, 110 A.2d 186, 191 (1955).

In the matter before us, the original agreement defined the parties' obligations with respect to future lease transactions. No obligations under the original agreement were to be created until such time as the parties executed schedules in compliance with the original agreement. Accordingly, the schedules did not define the parties' rights and obligations; rather, they defined the terms of individual transactions made in comformity with the original agreement.

---

2. Appellee does not dispute the application of Pennsylvania law, and there is authority for its use. M. S. Bremen, et al. v. Zapata Off-Shore Co., 407 U.S. 1, 92 S.Ct. 1907, 32 L.

Ed.2d 513 (1972), where the Supreme Court approved the validity of a forum-selection clause.

There is no proof the schedules purported to define or create rights and obligations other than those contained on the original contract.

2.) "New" North America, in dealing with National, assumed that it was operating pursuant to the original agreement as though it were a party to that agreement. No effort was made on the part of "new" North America to suggest that it was not a party to the original contract. It asserted in fact, that it signed the schedule "as a party to" the original Lease Agreement.

3.) National assumed that the schedules were a part of the original contract, and that it was dealing with the original contracting party. National alleges that it did not learn that "old" North America had been dissolved until March 25, 1970—almost two months after the obligations had come into default. Traders disputes this, but fails to offer any countervailing proof. Instead, Traders merely suggests that the date of National's first knowledge of the dissolution of "old" North America is immaterial.

Page 2 of each schedule contains an assignment of rentals from "new" North America to National. As an example, all schedules, like Schedule NA–12 recites:

"KNOW ALL MEN BY THESE PRESENTS THAT NORTH AMERICA CORPORATION, A TEXAS CORPORATION, HAS EXECUTED THIS DATE SCHEDULE NA–12 TO BE ATTACHED TO AND BECOME PART OF LEASE AGREEMENT DATED APRIL 28, 1969." (emphasis added).

This obviously is not the language of a contract separate from, and different than, the April 28, 1969 contract. It demonstrates an intent of "new" North America to be bound by and become a party to the terms of the original April 28, 1969 Agreement between old North America and National. In turn, Traders intent to be bound under the schedule is evidenced by, and unaffected by, Traders' unilateral delegations of its obligations to perform to new North America.

In finding that the schedules and the original agreement constitute a single integrated contract, together with Traders' admission that it is liable under the original agreement, it follows that Traders is obligated under each of the schedules. This is the only reasonable interpretation of the facts. Through the merger of "old" North America into Traders, Traders became obligated upon the original agreement. Traders thereby attempted to discharge its obligations by delegating its duties to its wholly-owned subsidiary, Argosy Corporation. To facilitate this, it changed Argosy's corporate name to North America. By virtue of this delegation of performance (and notwithstanding considerations of limited liability based on separate corporate entity), Traders remained obligated for performance of all duties bargained for under the lease agreement. Further, this conclusion is inescapable in view of a lack of either consent or contractual authority given by National to Traders to delegate duties. National's consent was never sought, nor was it granted to delegate its obligations. The contract prohibits assignment in the absence of written consent. (Equipment Lease Agreement, Section V(a) at 7). In considering a similar situation, the Pennsylvania Supreme Court established the following general rule:

"While a party to a contract may assign his rights and benefits thereunder, he may not, unless the contract so provides, assign his liability under the contract to perform duties involving his personal ability, integrity, credit or responsibility." Saxe v. Feinstein, 365 Pa. 473, 77 A.2d 419, 421 (1951).

For these above stated reasons, the decision of the district court, to the extent that it found Traders not liable for all schedules made pursuant to the Equipment Lease Agreement of April 28, 1969, is reversed. The district court's Order and Partial Summary

Judgment of January 23, 1973, is vacated, and the case remanded with instructions to proceed to a full trial of the matter before it.