HEMISPHERE NATIONAL
BANK, Appellant,

v.

DISTRICT OF COLUMBIA INSURANCE
GUARANTY ASSOCIATION, Appellee.

No. 79–169.

District of Columbia Court of Appeals.

Submitted Nov. 14, 1979.

Decided Feb. 25, 1980.

As Amended on Denial of Rehearing and
Rehearing En Banc June 10, 1980.

David M. Dorsen, Washington, D.C., for appellant.

J. Joseph Barse, Washington, D.C., for appellee.

Before NEWMAN, Chief Judge, and GALLAGHER and MACK, Associate Judges.

NEWMAN, Chief Judge:

This case involves the construction of the District of Columbia Insurance Guaranty Act (hereinafter "the Act"), D.C.Code 1978 Supp., §§ 35–1801 to –1817, a statute providing for the creation of the District of Columbia Insurance Guaranty Association (hereinafter DCIGA) to facilitate reimbursement of District of Columbia residents for covered insurance claims when the insurer becomes insolvent. The lower court, in interpreting the statute, held that despite a principal's default on a loan and a surety company's insolvency, appellant, Hemisphere National Bank, was not entitled to recover from the DCIGA since it withdrew with prejudice from the insurer's liquidation proceedings and thereby failed to establish a valid claim. Based on this holding, the court granted appellee's motion for summary judgment.

Appellant contends that the court erred in this ruling and in holding that it had to prevail in the insurer's insolvency proceeding prior to establishing a right to recovery under the Act. Notwithstanding the trial court's broad holding, appellee agrees with appellant that a claimant need not establish the validity of a claim in any proceeding other than one before the DCIGA itself. Appellee contends, and we agree, however, that appellant's actions in this case, whereby it took divergent positions to the prejudice of the DCIGA, thereafter barred appellant's claim against the DCIGA. In addition, as an alternative ground for affirmance, we find that appellant executed a novation of its claim against Wisconsin Surety. In Part I of this opinion we set forth the pertinent facts and lower court proceedings. In Part II, we discuss the effect of the prejudicial actions taken by appellant which now bar its claim against the DCIGA. In Part III, we analyze the facts and conclude that the action of Hemisphere National Bank in obtaining the proceeds from a deed of trust from the principal after the principal's default and the surety's insolvency, resulted in a novation thereby excusing the surety company, and accordingly the DCIGA, from any further liability.

I

Hemisphere National Bank is a national bank with its offices located in the District of Columbia. On August 16, 1974, the bank made a loan to Fancy Foods of Greenbank,

Ltd., a Maryland corporation, in the principal amount of $72,000. Monte F. Bourjaily, Jr., and Marietta M. Bourjaily, the sole shareholders of Fancy Foods, executed guarantees on the loan to the benefit of Hemisphere National Bank. In addition, the note of Fancy Foods was secured by a surety bond executed by the now insolvent Wisconsin Surety Corporation which was licensed to do business in the District of Columbia.

The Bourjailys also signed a separate bond agreement guaranteeing the loan to the Wisconsin Surety Corporation. In order to persuade the Wisconsin Surety Corporation to execute the bond guaranteeing repayment of the loan to the Hemisphere National Bank, the Bourjailys agreed to grant the corporation a fourth deed of trust on certain real estate owned by them in Montgomery County, Maryland. After this was accomplished, the Wisconsin Surety Corporation executed a bond guaranteeing repayment of Fancy Foods' loan to the Hemisphere National Bank.

Fancy Foods made payment on the note until March 20, 1975. On that date, Fancy Foods failed to make the monthly payment on the note thus constituting a default. The note contained the normal provision permitting acceleration upon default. Since March 20, 1975, Fancy Foods has continued to be in default and that deficiency has never been cured. On April 11, 1975, the Wisconsin Surety Corporation was determined to be insolvent and was ordered to be liquidated by the Circuit Court for Dane County, Wisconsin.

Officials of Hemisphere National Bank met concerning the loan of Fancy Foods and reached an agreement with the Bourjailys on June 10, 1975, whereby the Bourjailys granted to the bank a fifth deed of trust on the same real estate which was subject to the fourth deed of trust in favor of Wisconsin Surety. The bank's deed of trust was obtained on July 1, 1975 and foreclosure occurred in the fall of 1975. The bank acquired a surplus in excess of $30,000 from the foreclosure sale, after payment of notes secured by the first three deeds of trust. During the course of the foreclosure proceedings in Montgomery County, Maryland, the president of Hemisphere National Bank executed an affidavit which was filed with the court below. That affidavit refers to the loan made by the bank, the guarantee bond executed by the Wisconsin Surety Corporation, and the negotiations with the Bourjailys which resulted in their executing a deed of trust to the bank and states that the deed of trust was "to replace the surety bond provided by Wisconsin Surety Corporation and to induce Hemisphere National Bank to forbear from bringing suit on the note which was already in default."

On or about November 21, 1975, Hemisphere National Bank filed its proof of claim in the Circuit Court for Dane County against the Wisconsin Surety Corporation in the latter's liquidation proceedings. Based on the actions of the bank in obtaining the fifth deed of trust on the Montgomery County land, and $30,000 from its foreclosure, the liquidator for the Wisconsin Surety Corporation recommended that the bank not recover. Specifically, the liquidator contended that the bank, by obtaining the deed of trust, had elected under Wisconsin law to pursue its claim against the principal and thereby had waived its right against the surety corporation.

The bank noted an appeal from the liquidator's recommendation, but the appeal was never heard. Before the matter was ready for hearing, the Hemisphere National Bank withdrew its claim with prejudice. The Wisconsin court thereupon entered an order that the claim was irrevocably withdrawn.

Hemisphere National Bank filed a complaint in the Superior Court of the District of Columbia seeking recovery under the Act from the DCIGA for the loss it incurred as the result of Fancy Foods' defaulted loan and the insolvency of the Wisconsin Surety Corporation. On July 27, 1976, the bank filed a motion for summary judgment which was denied on October 28, 1976. On December 10, 1976, the DCIGA moved for summary judgment, which motion was also denied on May 3, 1977. The case was as-

signed to Judge Hannon for trial. Appearing before Judge Hannon, the DCIGA made an oral motion to stay the instant case on the grounds that the liquidation proceedings involving the Wisconsin Surety Corporation in which the bank had filed a motion were in progress, and should be concluded prior to the commencement of this suit. On August 5, 1977, the trial court granted the stay.

After the bank caused its claim in the liquidation proceedings to be dismissed with prejudice, the DCIGA filed a motion to dismiss the bank's complaint. By an order dated January 11, 1979, the trial court, treating the DCIGA's motion to dismiss as a motion for summary judgment, granted DCIGA's motion and denied the bank's motion for summary judgment as well as its pending motion to compel discovery. The court explained its decision stating:

> Hemisphere National Bank has an obligation to pursue its claim against the Wisconsin Surety Corporation in the State of Wisconsin insolvency proceeding to recover its pro rata share of the insolvent Surety Corporation's assets and thereby establish the unrecovered amount of the loan made to the borrower and thereafter to present its proof of claim for a sum certain to the District of Columbia Insurance Guaranty Association. By withdrawing its claim with prejudice from the liquidation proceedings in Wisconsin, Hemisphere National Bank has prevented the liquidator not only from determining the sum certain due and owing Hemisphere National Bank from the insolvent Surety's assets, but also, and more fundamentally from determining whether Hemisphere did in fact have a valid claim against the insolvent Wisconsin Surety Corporation.

This appeal followed.

## II

The purpose of the Act "is to provide a mechanism for the payment of covered claims under certain insurance policies to avoid excessive delay in payment and to avoid financial loss to claimants or policy-holders because of the insolvency of an insurer . . . ." D.C.Code 1978 Supp., § 35–1801. The definitional provision of the Act, § 35–1803, establishes several of the prerequisites which must be met in order for a party to be entitled to relief. Section 35–1803(6) defines the term "person" to include individuals, corporations, and associations. It is undisputed that Hemisphere National Bank is an unincorporated national bank association and, accordingly, a "person" within the meaning of the Act. Section 35–1803(3) of the Act defines "insolvent insurer" as an insurer "authorized to transact insurance in the District of Columbia, either at the time the policy was issued or when the insured event occurred, . . . ." who has been determined to be insolvent. The Wisconsin Surety Corporation falls within this definition. Third, the term "covered claim" is defined in § 35–1803(2) of the Act as "an unpaid claim . . . which arises out of and is within the coverage . . . of an insurance policy . . . if such insurer becomes an insolvent . . . and . . . the claimant or insured is a resident of the District of Columbia . . ." It is uncontested that Wisconsin Surety acted as a guarantor on a loan between Fancy Foods and Hemisphere National Bank.

Based on the aforementioned statutory definitions, appellant contends that the only prerequisites to establishing a right of recovery under the Act are the presentation of evidence demonstrating that the claimant is a District resident, that the insolvent insurer is authorized to transact business in the jurisdiction, and that the claim is a covered claim. Having established these facts, appellant now argues that it is automatically entitled to relief from the DCIGA.

Appellant's argument, however, ignores a fundamental requirement of the Act. Section 35–1806 of the Act sets forth the "Powers and Duties of the Association." Section 35–1806(a)(1) provides:

> [I]n no event shall the Association be obligated to a policyholder or claimant in an amount in excess of the obligation of

the insolvent insurer under the policy from which the claim arises;

(a)(2) provides:

[The Association shall] be deemed the insurer to the extent of its obligation on the covered claims and to such extent shall have all rights, duties, and obligations of the insolvent insurer as if the insurer had not become insolvent;

(a)(4) provides:

[The Association shall] investigate claims brought against the Association and adjust, compromise, settle, and pay covered claims to the extent of the Association's obligation and deny all other claims and may review settlements, releases and judgments to which the insolvent insurer or its insureds were parties to determine the extent to which such settlements, releases and judgments may be properly contested.

These sections, taken in conjunction, provide that the DCIGA is liable only to the extent of the insurer's obligation. As a result, if the insurer is not liable then the DCIGA is *a fortiori* released from any duty to pay.

An important corollary of the DCIGA's undertaking to pay claims against insolvent insurers is the subrogation of those claims to the DCIGA. Subrogation is explicitly provided for in the Act: "Any person recovering under this chapter shall be deemed to have assigned his rights under the policy to the Association to the extent of his recovery from the Association." D.C. Code 1978 Supp., § 35–1809(a).[1] That section further provides that the claimant cooperate with the Association "to the same extent as such person would have been required to cooperate with the insolvent insurer." *Id.* The intent of the Act that the DCIGA itself would undertake to pursue claims in liquidation proceedings is further evinced by subsections (b) and (c) of § 35–1809 of the Act, which provide for the filing of subrogated claims by the DCIGA in liquidation proceedings for the insolvent

insurer. This statutory scheme furthers the purpose of the Act by allowing the claimant to recover while "avoid[ing] excessive delay in payment", D.C. Code 1978 Supp., § 35–1801, and places the primary responsibility for pursuing the insolvent insurer on the DCIGA.

■ The trial court held here that the creditor, appellant Hemisphere National Bank, was barred in its claim against the DCIGA because the Bank's withdrawal from the Wisconsin liquidation proceeding "prevented the liquidator . . . from determining whether Hemisphere did in fact have a valid claim against the insolvent Wisconsin Surety Corporation." The court's decision misconstrues the Bank's obligations under the Act. Another statutory scheme might require a claimant to first establish the validity of a claim in a liquidation proceeding, but the Act does not require this by its terms. *Compare Nianick v. Edgewater Beach Hotel,* 28 Ill.App.3d 33, 328 N.E.2d 82 (1975) (under Illinois Insurance Guaranty Fund Act, Fund may elect either to pay all covered claims processed and determined by the liquidator, or it may process and determine all covered claims without the participation of the liquidator).

■ Furthermore, appellee DCIGA itself concedes in its brief that there is no obligation under the DCIGA Act to establish the validity of a claim before making a claim against the DCIGA: "There is nothing in the Insurance Guaranty Act that required the Bank to file a claim against the Liquidator. But once having filed that claim, it could not abandon it to the prejudice of IGA." The validity of a covered claim will be determined by the DCIGA, subject, of course, to a claimant's right to bring suit in Superior Court to establish the validity of a claim against the DCIGA and thus the DCIGA's liability on the claim. *See* D.C. Code 1978 Supp., § 35–1806(a)(4) ("[The Association shall] investigate claims brought against the Association and adjust, compromise, settle, and pay covered claims *to the extent of the Associa-*

---

**1.** *Compare City Stores Co. v. Lerner Shops of D. C., Inc.,* 133 U.S.App.D.C. 311, 410 F.2d 1010 (1969) (subrogation, of cause of action against third party, by operation of law where insurer pays insured's covered claim).

*tion's obligation and deny all other claims . . . .")* (emphasis added). The essence of appellee's position, which we accept here, is that while a claimant has no obligation to file a claim in a liquidation proceeding, it may not, under familiar principles of equity, take actions which prejudice the subrogation rights to which the DCIGA would be entitled. Once having filed a claim in the Wisconsin proceeding, appellant owed a duty to the DCIGA to preserve, in that proceeding, the DCIGA's rights to the liquidation claim. If the Bank had faithfully pursued the liquidation claim to its conclusion, the DCIGA would not have been prejudiced, and, as the Bank notes, any proceeds received by the Bank from the liquidation claim would correspondingly reduce any payment from the DCIGA to the Bank on its claim.

 Instead of pursuing the liquidation claim, the Bank took divergent courses of action. First, it obtained and subsequently received proceeds in foreclosure on a Fifth Deed of Trust as additional security on the loan. The effect of these proceedings, which we hold constituted a novation which released Wisconsin Surety and thereby rendered the Bank's claim under the Act invalid, is discussed in Part III below. Second, the Bank, after it had filed its claim in the liquidation proceeding, withdrew that claim with prejudice.

Appellant asserts that since it notified the DCIGA of its intention to withdraw, thereby giving the DCIGA an opportunity to intervene if it so chose, the DCIGA cannot have been prejudiced by the susequent withdrawal. If the only effect of the withdrawal was to require a new, timely filing, appellant would be correct. Since there is no obligation to file in the liquidation proceeding, a filing followed by withdrawal which would only operate to nullify the previously timely filing cannot be deemed to violate any obligation of the claimant. Here, by contrast, appellant's actions which constitute the novation, discussed in Part III, operated under Wisconsin law to invalidate appellant's claim in the liquidation proceeding. Further-

more, appellant withdrew its claim after it had noticed an appeal from the liquidator's recommendation that the claim be disallowed. These actions likely prejudiced any claim the DCIGA would be entitled to pursue as subrogee of appellant under the Act. As an equitable matter, appellant's claim should be barred only to the extent that the DCIGA's rights of subrogation are prejudiced. By withdrawing with prejudice from the liquidation proceeding, appellant foreclosed any definitive determination of the value of its claim in liquidation. We need not remand for a finding of the extent that the DCIGA was prejudiced, however, because the facts of this case establish a novation as an alternative basis for completely barring appellant's claim.

### III

 A novation is generally defined as the discharge of a valid existing contract by the replacement of one debtor for another or the substitution of a new obligation in lieu of an already existing responsibility. *City National Bank of Huron v. Fuller*, 52 F.2d 870 (8th Cir. 1931); 66 C.J.S. *Novation* § 1 at 681 (1950); 58 Am.Jur.2d *Novation* § 1 at 517 (1971). A novation of debtors is effectuated when a creditor agrees or intends to extinguish his claim against the original debtor in exchange for a promise by a third person to assume the existing obligation. *Lincoln v. National Metropolitan Bank*, 35 App.D.C. 362, 30 L.R.A.,N.S. 1215 (1910), *aff'd*, 37 App.D.C. 254 (1911); *Ingalls Iron Works Co. v. Fruehauf Corp.*, 518 F.2d 966 (5th Cir. 1975); *In re Troy*, 490 F.2d 1061 (6th Cir. 1974); *Andrews v. St. Louis Joint Stock Land Bank*, 127 F.2d 799 (8th Cir. 1942); *Jay Cee Fish v. Cannarella*, 279 F.Supp. 67 (D.C.S.C.1968). The novation, accordingly, is accomplished by the substitution and promise of the third person to discharge the obligation incurred by the original debtor.

 In order for a novation to occur, it is generally accepted that there must be a mutual agreement between the three parties, the creditor, the original debtor,[2] and

---

2. Concurrence of the original debtor is not always required. *See Packel v. McCarthy*, 120 Pa.Super. 545, 182 A. 769 (1936).

the third party, in which it is understood that the new party is a replacement for the original debtor. *Ingalls Iron Works Co., supra; National Equipment Leasing Corp. v. Farrier*, 486 F.2d 258 (10th Cir. 1973); *Fontainbleau Hotel Corp. v. Crossman*, 323 F.2d 937 (5th Cir. 1963); *United States to Use Park-Lock Appliers of New Jersey v. J.A.J. Construction Co.*, 137 F.2d 584 (3rd Cir. 1943); Annot., 61 A.L.R.2d 750, 759 (1958). As a result of the new agreement, the original debtor is released from any further liability.[3] *Lincoln v. National Metropolitan Bank, supra; Westinghouse Electric Supply Co. v. Fidelity and Deposit Co. of Maryland*, 560 F.2d 1109 (3d Cir. 1977); *Fontainbleau Hotel Corp. v. Crossman, supra; Jay Cee Fish v. Cannarella, supra.*

■ A determination as to whether a novation has resulted from a particular transaction will ultimately depend on the intention of the parties as indicated by the facts and circumstances of the situation. *Capital National Bank of Tampa v. Hutchison*, 435 F.2d 46 (5th Cir. 1970); 2 Williston, Contracts 3d § 353 (1959). These principles were applied in *Lincoln v. National Metropolitan Bank, supra,* where the court held that the bank's acceptance of the personal note of the president (Purnell) of a construction company in lieu of an overdue note from the construction company constituted a novation. Despite the fact that the construction company's note became collateral security for the payment of the personal note, the court concluded that the company was released from any further obligation on the original note. In explaining its decision, the court stated:

The Purnell note, by this transaction, became the primary evidence of indebtedness. The bank could not recover on both notes. Neither could it select which one it might treat as the primary security. It had placed itself in a position where it could only dispose of the construction company note as collateral in the event of its failure to recover on the Purnell note, —a contingency which never happened. The law does not favor uncertainties. . . . The transaction must be treated as a novation, whereby the bank surrendered its security under the assignment from the construction company, and accepted the primary obligation of Purnell, secured by the construction company note, which Purnell put up as collateral. [35 App.D.C. at 368, 369.]

■ In the present case, a similar transaction occurred whereby Hemisphere Bank executed a deed of trust with a third party which released the Wisconsin Surety Corporation from any liability under the original loan agreement. Specifically, shortly after the principal defaulted on the loan and the Wisconsin Surety Corporation was declared to be insolvent, the Hemisphere National Bank reached an agreement with the Bourjailys, the guarantors on the loan and the sole shareholders of the corporation to which the money was loaned, whereby the Bourjailys granted to the bank a fifth deed of trust on some real estate in Montgomery County. This was precisely the same real estate which had been previously granted in a fourth deed of trust to the Wisconsin Surety Corporation as security for its acting as guarantor in the original loan transaction between the Bourjailys and the bank.

During the course of the foreclosure proceedings on the aforementioned land the president of Hemisphere National Bank executed an affidavit which provided that the deed of trust was "*to replace the surety bond* provided by the Surety Corporation and to induce Hemisphere National Bank to forbear from bringing suit on the note which was already in default." (emphasis added.) As a result of the transaction, the record reveals that the bank received over $30,000 from the sale of the property while the liquidator of the Wisconsin Court, who held the fourth deed of trust on the same property as an asset of the insolvent surety company, received nothing. Based on the affidavit and the receipt of the proceeds from the foreclosure sale we find that a novation resulted whereby the bank "agree[d] to release and extinguish [its] claim against [its] debtor [the surety company] and to accept in lieu thereof a prom-

---

**3.** *Contra, Ingalls Iron Works Co., supra.*

ise of a third person [the Bourjailys] to discharge the obligation." 66 C.J.S. *Novation* § 15 at 697 (1950) (footnote omitted). Just as in *Lincoln, supra,* where the bank substituted a note from Purnell for the corporation's indebtedness resulting in a novation, Hemisphere National Bank's execution of the deed of trust and receipt of the foreclosure funds excused Wisconsin Surety Corporation from any further liability. Therefore, lacking a valid claim against Wisconsin Surety, Hemisphere National Bank is accordingly not entitled to reimbursement from the DCIGA.

*Affirmed.*