CHATHAM CONDOMINIUM ASSOCIATIONS, etc., et al., Plaintiffs-Appellants,

v.

CENTURY VILLAGE, INC., etc., et al., Defendants-Appellees.

KENT CONDOMINIUM ASSOCIATION, etc., et al., Plaintiffs-Appellants,

v.

CENTURY VILLAGE, INC., etc., et al., Defendants-Appellees.

NORTHAMPTON O CONDOMINIUM ASSOCIATION, et al., Plaintiffs-Appellants,

v.

CENTURY VILLAGE, INC., etc., et al., Defendants-Appellees.

SUSSEX CONDOMINIUM ASSOCIATIONS, etc., et al., Plaintiffs-Appellants,

v.

CENTURY VILLAGE, INC., etc., et al., Defendants-Appellees.

No. 76–4286.

United States Court of Appeals, Fifth Circuit.

July 2, 1979.

---

Michael B. Small, Rod Tennyson, West Palm Beach, Fla., for plaintiffs-appellants.

Charles Ruberg, Douglas B. Brown, Asst. Attys. Gen., State of Florida, Dept. of Legal Affairs, Tallahassee, Fla., for The State of Florida.

Gerald F. Richman, Miami, Fla., for defendants-appellees.

Before JONES, AINSWORTH and HILL, Circuit Judges.

JAMES C. HILL, Circuit Judge:

In this appeal we are called upon to decide another one of the difficult issues escaping from the Pandora's box of condominium antitrust litigation.[1] Specifically, we must decide whether the district court had subject matter jurisdiction over an antitrust claim alleging an illegal tie-in between the sale of a condominium unit and

1. *See, e. g., Imperial Point Colonnades Condominium, Inc. v. Mangurian*, 549 F.2d 1029 (5th Cir.), *cert. denied*, 434 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1977); *Buckley Towers Condominium, Inc. v. Buchwald*, 533 F.2d 934 (5th Cir. 1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 571 (1977); *Miller v. Granados*, 529 F.2d 393 (5th Cir. 1976).

the purchase of a recreational facilities lease. We find that the district court erroneously concluded that it was without subject matter jurisdiction over the antitrust claim, and we reverse.

## I.

Appellants, condominium unit owners and their condominium associations (hereinafter appellants or purchasers), brought private treble damage actions [2] against appellees, developers of the Century Village condominium development (hereinafter appellees or Century Village), alleging that a requirement that condominium purchasers enter into a 99-year recreational facilities lease constituted an illegal tying arrangement in violation of Section 1 of the Sherman Act,[3] 15 U.S.C.A. § 1, and Section 3 of the Clayton Act,[4] 15 U.S.C.A. § 14. On July 1, 1976, the district court entered an Order of Dismissal, dismissing appellants' pendent state claims and dismissing the condominium associations as parties plaintiff for lack of standing to maintain a class action on behalf of their members. In its Order the district court, *sua sponte*, scheduled a preliminary hearing for the purpose of affording appellants an opportunity to present evidence of the "involvement of a not insubstantial amount of interstate commerce in the recreational facility lease which they allege in their complaints to be the tied product."

2. Four separate actions were brought by the Chatham, Kent, Northampton and Sussex Condominium Associations and certain unit owner-members against Century Village. These separate actions were consolidated by the district court.

3. Section 1 of the Sherman Act provides, in pertinent part:
 Every contract, combination in the form of trust or otherwise, or conspiracy, in restraint of trade or commerce among the several States, or with foreign nations, is declared to be illegal . . . .

4. Section 3 of the Clayton Act provides:
 It shall be unlawful for any person engaged in commerce, in the course of such commerce, to lease or make a sale or contract for sale of goods, wares, merchandise, machin-

At the hearing, conducted on July 13, 1976, the court heard testimony from various witnesses and accepted a proffer of evidence prepared by appellants. The proffer showed that appellants were prepared to prove the following:

Century Village is a sprawling condominium development located in Palm Beach County, Florida. Consisting of 7,853 condominium units and inhabited by over 14,000 residents, this one square mile complex was constructed between 1969 and 1974 at a cost of approximately 125 million dollars. The construction of this project involved the significant use of out-of-state materials, personnel and financing.

Approximately ninety percent of the purchasers of condominium units were from states other than Florida and approximately fifteen percent of these out-of-state purchasers have not relocated to Florida, choosing instead to use their condominiums as a second home or investment property. These out-of-state purchasers were attracted to Century Village by an energetic advertising campaign which included the use of advertisements in out-of-state newspapers, brochures mailed through the United States mail, long-distance telephone solicitation, and billboards placed along interstate highways. In the years 1973 and 1974 alone, Century Village spent 1.5 million dollars for advertising. Most of this advertising was directed towards non-Florida residents, particularly retirees.

ery, supplies, or other commodities, whether patented or unpatented, for use, consumption, or resale within the United States or any Territory thereof or the District of Columbia or any insular possession or other place under the jurisdiction of the United States, or fix a price charged therefor, or discount from, or rebate upon, such price, on the condition, agreement, or understanding that the lessee or purchaser thereof shall not use or deal in the goods, wares, merchandise, machinery, supplies, or other commodities of a competitor or competitors of the lessor or seller, where the effect of such lease, sale, or contract for sale or such condition, agreement, or understanding may be to substantially lessen competition or tend to create a monopoly in any line of commerce.

Prior to the sale of any of the condominium units, Century Village and each of the newly-formed condominium associations entered into a lease of the recreational facilities binding all future and subsequent purchaser-members in the condominium association to the provisions of the lease agreement. As a condition precedent to ownership, the contract of purchase also required the purchaser to execute the lease agreement. The lease agreement provided that payment of the rental for the recreational facilities lease would be a common expense, assessed by the condominium association against unit owners; failure to pay the rental fee would subject the purchaser's condominium to a lien. The annual rental fees collected by Century Village under the lease agreements totalled 4.5 million dollars, with $675,000 of that amount coming from out-of-state residents.

Finally, the proffer disclosed appellants' intention to prove that the recreational facilities leases in question foreclosed the development of competing recreational facilities that would have been constructed and operated. These facilities would have allegedly involved substantial investments from states other than Florida.

Following the conclusion of the hearing, the court permitted counsel to submit additional evidence until 5:00 p. m. on July 19, 1976. On August 9, 1976, the district court entered an order dismissing appellants' complaints due to lack of subject matter jurisdiction, concluding that "the activities complained of did not occur in the flow of interstate commerce nor did they substantially affect it." Appellants filed a motion for reconsideration and rehearing and a motion for leave to amend on August 20, 1976; the court denied these motions on September 1, 1976. This appeal followed.

## II. JURISDICTION

Count I of appellants' lawsuit alleged that Century Village illegally tied the execution of a recreational facilities lease to the purchase of condominium units at the Century Village complex; this tying arrangement was alleged to be a violation of both Section 1 of the Sherman Act, 15 U.S.C.A. § 1, and Section 3 of the Clayton Act, 15 U.S.C.A. § 14. The district court concluded that it had no subject matter jurisdiction under either the Sherman Act or the Clayton Act. Because the jurisdictional tests under the two acts differ, *see generally*, L. Sullivan, *Handbook of the Law of Antitrust* § 233 (1st ed. 1977), we discuss them separately.

### A. The Sherman Act.

 In enacting the Sherman Act, there can be little doubt that Congress intended to exercise its power to the fullest extent under the Commerce Clause. *United States v. Frankfort Distilleries, Inc.*, 324 U.S. 293, 65 S.Ct. 661, 89 L.Ed. 951 (1945); *United States v. South-Eastern Underwriters Association*, 322 U.S. 533, 64 S.Ct. 1162, 88 L.Ed. 1440 (1944); *Apex Hosiery Co. v. Leader*, 310 U.S. 469, 60 S.Ct. 982, 84 L.Ed. 1311 (1940). And under current interpretations of the Commerce Clause, the scope of congressional power is expansive; when national interests are at stake, seemingly local and wholly intrastate activities have been adjudged to fall within the sweep of the commerce power. *See, e. g., Perez v. United States*, 402 U.S. 146, 91 S.Ct. 1357, 28 L.Ed.2d 686 (1971) (local loan sharking subject to federal criminal sanctions); *Katzenbach v. McClung*, 379 U.S. 294, 85 S.Ct. 377, 13 L.Ed.2d 290 (1964) (local restaurant subject to federal control because it purchased $70,000 of meat from a local supplier who, in turn, purchased it from outside the state); *Wickard v. Filburn*, 317 U.S. 111, 63 S.Ct. 82, 87 L.Ed. 122 (1942) (Congress held to have power to control amount of wheat grown by farmers for self-consumption because the total demand for wheat on the interstate market would be reduced if farmers were allowed to grow and consume their own wheat). As the foregoing cases illustrate, the power of Congress to regu-

late commerce is "as broad as the need that evokes it."[5]

Recent decisions by the Supreme Court confirm that the jurisdictional reach of the Sherman Act is coextensive with the broad-ranging power of Congress under the Commerce Clause. In *Burke v. Ford*, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967), Oklahoma liquor retailers sued under Section 1 of the Sherman Act to enjoin a state-wide market division by Oklahoma liquor wholesalers. Notwithstanding that unit sales to wholesalers *increased* while the market division was in effect, the Supreme Court found an effect on interstate commerce sufficient to support jurisdiction:

> Horizontal territorial divisions almost invariably reduce competition among the participants. When competition is reduced, prices increase and unit sales decrease. The wholesalers' territorial division here almost surely resulted in fewer sales to retailers—hence fewer purchases from out-of-state distillers—than would have occurred had free competition prevailed among the wholesalers. In addition the wholesalers' division of brands meant fewer wholesale outlets available to any one out-of-state distiller. Thus, the state-wide wholesalers' market division inevitably affected interstate commerce.

389 U.S. at 321–22, 88 S.Ct. at 444 (citations omitted).

In *Burke,* the Supreme Court was willing to assume an effect on interstate commerce where the conduct in question, horizontal market divisions, typically has an anticompetitive effect on interstate commerce. *See* P. Areeda, *Antitrust Analysis* § 183 (2d ed. 1974).

The Supreme Court's decision in *Goldfarb v. Virginia State Bar,* 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975), further illustrates the expansive jurisdictional reach of the Sherman Act. There, a county bar association's minimum fee schedule fixed prices for title examinations. Although the

activity was purely local, the Court found the requisite nexus with interstate commerce to support Sherman Act jurisdiction: the real estate transactions in issue were found by the Court to be interstate in nature due to the presence of a significant number of loans furnished by out-of-state lenders, a sizeable portion of which were guaranteed under federal mortgage insurance programs; because title examinations were viewed as an integral part of this interstate transaction, the necessary connection with interstate commerce was supplied. Once again, the Court found the lack of demonstrable effects on interstate commerce to be of no moment. Neither the absence of a showing that home buyers were discouraged from purchasing homes by the challenged activities, nor the inability of the buyers to show that the minimum fee schedule actually raised prices, altered the Court's conclusion that interstate commerce was sufficiently affected to invoke the jurisdiction of the Sherman Act.

Finally, *Hospital Building Co. v. Trustees of Rex Hospital,* 425 U.S. 738, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976), is instructive. In *Rex Hospital,* a small proprietary hospital, Mary Elizabeth, brought suit against another hospital, Rex, under Sections 1 and 2 of the Sherman Act, alleging that Rex had conspired with others to block the expansion and relocation of Mary Elizabeth within Raleigh, North Carolina. The Court found an effect on interstate commerce based upon the allegations in the complaint that the blocked expansion of Mary Elizabeth would cause the following reverberations in commerce: a reduction in the amount of medicine and supplies purchased from out-of-state sellers; diminished revenues from out-of-state insurance companies or the federal government; a decrease in the management service fee paid to its parent company, a Georgia-based Delaware corporation; and lost revenues to out-of-state lenders who were expected to finance the planned expansion. The effect on com-

---

5. *Carter v. Carter Coal Co.*, 298 U.S. 238, 328, 56 S.Ct. 855, 880, 80 L.Ed. 1160 (1936) (Cardozo, J., dissenting).

merce was still viewed as "substantial" even though no enterprise could be expected to fold and market price was unaffected.

■ Thus, any challenge to subject matter jurisdiction in a Sherman Act case is necessarily resolved by answering the following question: Can Congress prohibit the challenged conduct under the Commerce Clause? If so, then the conduct is within the jurisdictional reach of the Sherman Act. See Rasmussen v. American Dairy Association, 472 F.2d 517 (9th Cir. 1972), cert. denied, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973).

■ There are two jurisdictional tests under the Sherman Act which relate to the power of Congress under the Commerce Clause. Activity is reachable by the Sherman Act if (1) it occurs "in" or "in the flow of" interstate commerce ("flow" theory) or (2) if it substantially affects interstate commerce ("effect" theory). See Burke v. Ford, 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967); Harold Friedman, Inc. v. Thorofare Markets, Inc., 587 F.2d 127 (3d Cir. 1978); Taxi Weekly, Inc. v. Metropolitan Taxicab Board of Trade, Inc., 539 F.2d 907 (2d Cir. 1976); Lehrman v. Gulf Oil Corp., 464 F.2d 26 (5th Cir.), cert. denied, 409 U.S. 1077, 93 S.Ct. 687, 34 L.Ed.2d 665 (1972); L. Sullivan, Handbook of the Law of Antitrust § 233a (1st ed. 1977). The district court concluded that neither test was satisfied in the present case. Because of our conclusion that the alleged tying arrangement had a substantial impact on interstate commerce, we limit our discussion to the second jurisdictional test.

■ Under the "effect" theory of jurisdiction, an activity is subject to the Sherman Act if it "substantially and adversely affects interstate commerce." Hospital Building Co. v. Trustees of Rex Hospital, 425 U.S. 738, 743, 96 S.Ct. 1848, 1852, 48

L.Ed.2d 338 (1976), quoting Gulf Oil Corp. v. Copp Paving Co., 419 U.S. 186, 195, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974) and Mandeville Island Farms, Inc. v. American Crystal Sugar Co., 334 U.S. 219, 234, 68 S.Ct. 996, 92 L.Ed. 1328 (1948). "If it is interstate commerce that feels the pinch, it does not matter how local the operation which applies the squeeze." United States v. Women's Sportswear Manufacturers Association, 336 U.S. 460, 464, 69 S.Ct. 714, 716, 93 L.Ed. 805 (1949). And, as the Goldfarb [6] and Burke [7] cases illustrate, the quantitative substantiality of the impact on interstate commerce is not the controlling consideration; "if a local activity has in a practical sense a significant impact on competition in commerce and if the commerce so affected is substantial in amount, the Act applies to the local activity even though the activity does not reduce the quantity of interstate commerce in any discernible degree, or perhaps even if it does not alter it at all, or, indeed increases it." L. Sullivan, Handbook of the Law of Antitrust § 233a at 710 (1st ed. 1977). Goldfarb, of course, represents an expansion of the Sherman Act approaching, if not reaching, the zenith of congressional power under the Commerce Clause. But we do not write today to delimit the jurisdictional reach of the Sherman Act; the present case is an easy one, for the activities complained of fall well within the jurisdiction of the Sherman Act.

We disagree with the district court that the activities complained of in this case did not have an effect on interstate commerce. In attempting to prove an effect on interstate commerce sufficient to support jurisdiction, the purchasers relied heavily on the fact that the alleged tying arrangement here involved a "not insubstantial" amount of interstate commerce, a factor which is also one of the four substantive elements of an illegal tying arrangement.[8] The district

---

6. 421 U.S. 773, 95 S.Ct. 2004, 44 L.Ed.2d 572 (1975).

7. 389 U.S. 320, 88 S.Ct. 443, 19 L.Ed.2d 554 (1967).

8. There are four substantive elements of an illegal tying arrangement:

(1) two separate products, the tying product and the tied product;

(2) sufficient economic power in the tying market to coerce purchase of the tied product;

(3) involvement of a not insubstantial amount of interstate commerce in the tied market; and

court held that the purchasers' reliance on this factor was misplaced, since the involvement of a "not insubstantial" amount of commerce is a substantive element of a violation and questions of jurisdiction and whether a substantive violation exists are separate and distinct matters. Although issues of jurisdiction and substance are different,[9] we fail to see why the involvement of a "not insubstantial" amount of interstate commerce is irrelevant to a decision of the jurisdictional issue.

■ We begin by noting the remarkable similarity between the jurisdictional test and the substantive element itself. To support a finding of jurisdiction, there must be a "substantial and adverse" effect on interstate commerce;[10] the substantive element of an illegal tying arrangement requires that "a 'not insubstantial' *amount of interstate commerce* [be] *affected.*" *Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 6, 78 S.Ct. 514, 518, 2 L.Ed.2d 545 (1958) (emphasis added).[11] Thus, both the jurisdictional test and the substantive element require that *interstate commerce* be significantly affected; and unlike the jurisdictional test, where the quantitative substantiality of the effect on commerce is not

important,[12] the substantive element additionally requires that the *amount* of interstate commerce so affected be "not insubstantial." At the very least, then, the showing of a "not insubstantial" amount of interstate commerce affected by the challenged conduct satisfies the jurisdictional test of the Sherman Act. *Northern v. McGraw-Edison Co.*, 542 F.2d 1336, 1346 (8th Cir. 1976), *cert. denied*, 429 U.S. 1097, 97 S.Ct. 1115, 51 L.Ed.2d 544 (1977); *see also* P. Areeda, *Antitrust Analysis* § 183 (2d ed. 1974). To hold, as the district court did, that the jurisdictional test is more restrictive than the substantive reach of the Act is inconsistent with the now well-established principle that the reach of the Sherman Act is coextensive with the power of Congress to regulate interstate commerce.[13]

■ The purchasers have alleged facts which, if proven, would establish that a "not insubstantial" amount of interstate commerce is affected by this tying arrangement. According to the allegations in the purchasers' proffer, which we accept as true,[14] a gross annual rental fee of 4.5 million dollars was paid by the condominium unit owners under the recreational facilities leases. This amount represents a signifi-

---

(4) anticompetitive effects in the tied market. *Driskill v. Dallas Cowboys Football Club, Inc.*, 498 F.2d 321, 323 (5th Cir. 1974), *quoting Coniglio v. Highwood Services, Inc.*, 495 F.2d 1286, 1289 (2d Cir.), *cert. denied*, 419 U.S. 1022, 95 S.Ct. 498, 42 L.Ed.2d 296 (1974). *See also Northern Pacific Railway Co. v. United States*, 356 U.S. 1, 78 S.Ct. 514, 2 L.Ed.2d 545 (1958).

9. *See Rasmussen v. American Dairy Association*, 472 F.2d 517, 521–22 (9th Cir. 1972), *cert. denied*, 412 U.S. 950, 93 S.Ct. 3014, 37 L.Ed.2d 1003 (1973).

10. *Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 743, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976).

11. *See also* note 8, *supra*.
 This substantive element has been· interpreted by the Supreme Court to require that "a total amount of business, substantial enough in terms of dollar-volume so as not to be merely *de minimis*, is foreclosed to competitors by the tie . . . ." *Fortner Enterprises v. United States Steel Corp.*, 394 U.S.

495, 501, 89 S.Ct. 1252, 1258, 22 L.Ed.2d 495 (1969) (*Fortner I*), *after remand, United States Steel Corp. v. Fortner Enterprises*, 429 U.S. 610, 97 S.Ct. 861, 51 L.Ed.2d 80 (1977).

12. *See* text following note 7, *supra*.

13. *See Taxi Weekly, Inc. v. Metropolitan Taxicab Board of Trade, Inc.*, 539 F.2d 907, 910 (2d Cir. 1976):
 If the Act constituted an exercise of "all the power" Congress constitutionally possessed to regulate interstate commerce, the jurisdictional definition of interstate commerce cannot be more restrictive than the substantive one, for then an area of interstate commerce would be jurisdictionally unreachable under the Act.

14. Century Village stipulated, for the purpose of the preliminary hearing, to the truthfulness of the allegations contained in the proffer. We therefore accept the allegations of the proffer as true in deciding this appeal. *See Hospital Building Co. v. Trustees of Rex Hospital*, 425 U.S. 738, 740, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976).

cant foreclosure of the leisure-time market to competitors in the recreational facilities industry. Century Village makes much over the fact that these condominium unit owners are confined to the West Palm Beach County area and that therefore the effect is local and not interstate in nature. Assuming arguendo that only West Palm Beach area purchasers were victimized by this tying arrangement, it does not follow that interstate commerce is not affected; indeed, as the uncontroverted testimony of one deponent shows,[15] out-of-state companies were discouraged from entering the West Palm Beach area because the market for recreational facilities was effectively tied up by the condominium developers, particularly Century Village. The construction of recreational facilities by these out-of-state competitors would have involved, it is alleged, the significant use of out-of-state personnel, materials and financing. Moreover, according to the allegations of the purchasers' proffer, approximately $675,000 is paid annually in rental fees by non-residents who use their Century Village condominium as a second home or as investment property. This amount of spendable recreational income is foreclosed to recreational facilities competitors in other states. Taken as a whole, we believe the record as it now stands establishes facts sufficient[16] to overcome this pretrial jurisdictional attack.

### B. *The Clayton Act*

■ The jurisdictional scope of the Clayton Act is much narrower than that of the Sherman Act. The "in commerce" language of the Clayton Act[17] has been interpreted to require that the activities complained of must occur "in" or "in the flow" of interstate commerce to be reached by the Clayton Act. *See Gulf Oil Corp. v. Copp Paving Co.,* 419 U.S. 186, 201–02, 95 S.Ct. 392, 42 L.Ed.2d 378 (1974); *Harold Friedman, Inc. v. Thorofare Markets, Inc.,* 587 F.2d 127, 135 n.27 (3d Cir. 1978); *Battle v. Liberty National Life Insurance Co.,* 493 F.2d 39, 48 (5th Cir. 1974), *cert. denied,* 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975); L. Sullivan, *Handbook of the Law of Antitrust* § 233b (1st ed. 1977). When jurisdiction is based on the theory that an activity in question occurred in interstate commerce, no showing of an effect on interstate commerce is required. *Greenville Publishing Co. v. The Daily Reflector, Inc.,* 496 F.2d 391, 395 n.6 (4th Cir. 1974); L. Sullivan, *Handbook of the Law of Antitrust* § 233a (1st ed. 1977).

■ The purchasers rely on the following allegations, which are accepted as true,[18] to establish that the activities complained of occurred in the flow of interstate commerce:

(1) Ninety percent of the purchasers of condominium units came from out-of-state;

(2) non-resident purchasers were attracted by extensive advertising utilizing out-of-state newspapers, brochures mailed through the United States mail, long-distance telephone solicitation, and billboards placed along interstate highways;

(3) fifteen percent of the out-of-state purchasers have not relocated to Florida

---

15. Ann Daffner, Vice President of Vic Tanny International, testified that her company chose not to open a health spa in the West Palm Beach area because there was not enough "spendable recreational income in the area . . . ." Deposition of Ann Daffner at 15. According to Daffner, most of the spendable recreational income in the area was tied up by the recreational facilities leases imposed by the condominium developers, particularly Century Village. Deposition of Ann Daffner at 20. The purchasers also presented the affidavits of other executives in the recreational facilities business who were expected to give similar testimony. *See* the affidavits of Lesley McWhorter

of YMCA and Wayne Leroy Upton of Universal Health Spas. Record at 1737, 1741.

16. By limiting our discussion to these factors we do not mean to suggest that these factors are the only ones sufficient to establish an effect on interstate commerce; the purchasers may continue to rely on other allegations to establish jurisdiction. We simply find that the factors mentioned above, if proven, would be sufficient, standing alone, to establish the jurisdictional threshold.

17. *See* note 4, *supra.*

18. *See* note 14, *supra.*

and continue to pay for the recreational leases and mortgages through interstate mail and banking facilities;

(4) construction of the Century Village complex involved the significant use of out-of-state materials, financing and labor;

(5) the recreational facilities were and continue to be furnished and equipped extensively with products, appliances, furniture and equipment purchased from outside the state of Florida;

(6) personnel including managers, laborers, entertainers, lecturers and teachers have been and continue to be drawn from out-of-state for the performance of labor, services and entertainment at the recreational facilities;

(7) a significant number of out-of-state lending institutions provided funds in connection with the sales involved here.

The district court, without explanation, found the purchasers' allegations to be insufficient to establish jurisdiction under the Clayton Act. We cannot agree. If ultimately proven, the purchasers' allegations portray Century Village as a business enterprise which in all stages of its operation—construction and development, marketing and selling, repair and maintenance—is engaged in interstate commerce. We believe that the combination of these factors [19] is sufficient to withstand this pretrial jurisdictional attack.

In conclusion, we hold that the facts *as presently developed* on this record are sufficient to support jurisdiction under either the Clayton or Sherman Acts. We express no opinion as to whether the jurisdictional facts, as developed fully on the record after trial, will establish jurisdiction.

### III. PREMATURE DISMISSAL

 The result we reach today is in accord with, if not partially compelled by, the well-established principle in this Circuit that premature dismissals of antitrust claims for lack of subject matter jurisdic-

tion are not favored "where the factual and jurisdictional issues are completely intermeshed . . . ." *McBeath v. Inter-American Citizens for Decency Committee*, 374 F.2d 359, 363 (5th Cir.), *cert. denied*, 389 U.S. 896, 88 S.Ct. 216, 19 L.Ed.2d 214 (1967). *See also Battle v. Liberty National Life Insurance Co.*, 493 F.2d 39, 47 (5th Cir. 1974), *cert. denied*, 419 U.S. 1110, 95 S.Ct. 784, 42 L.Ed.2d 807 (1975); *Mortensen v. First Federal Savings & Loan Association*, 549 F.2d 884, 892–96 (3d Cir. 1977). In such situations "the jurisdictional issues should be referred to the merits, for it is impossible to decide the one without the other." 374 F.2d at 363. When jurisdictional issues are intertwined with the merits, the adjudication of the jurisdictional issue in accordance with the procedure under a 12(b)(1) motion fails to offer the procedural safeguards attendant upon proceedings under a 12(b)(6) motion or a motion for summary judgment under Rule 56. As the Third Circuit has stated:

> The basic difference among the various 12(b) motions is, of course, that 12(b)(6) alone necessitates a ruling on the merits of the claim, the others deal with procedural defects. Because 12(b)(6) results in a determination on the merits at an early stage of plaintiff's case, the plaintiff is afforded the safeguard of having all its allegations taken as true and all inferences favorable to plaintiff will be drawn. The decision disposing [of] the case is then purely on the legal sufficiency of plaintiff's case: even were plaintiff to prove all its allegations, he or she would be unable to prevail. In the interests of judicial economy it is not improper to dispose of the claim at that stage. If the court considers matters outside the pleadings before it in a 12(b)(6) motion, the above procedure will automatically be converted into a Rule 56 summary judgment procedure. Here there are further safeguards for the plaintiff: in addition to having all of plaintiff's allegations tak-

---

19. The purchasers may continue to rely on other allegations to establish jurisdiction under the Clayton Act. *See* note 16, *supra*.

en as true, with all their favorable inferences, the trial court cannot grant a summary judgment unless there is no genuine issue of material fact.

The procedure under a motion to dismiss for lack of subject matter jurisdiction is quite different. At the outset we must emphasize a crucial distinction, often overlooked, between 12(b)(1) motions that attack the complaint on its face and 12(b)(1) motions that attack the existence of subject matter jurisdiction in fact, quite apart from any pleadings. The facial attack does offer similar safeguards to the plaintiff: the court must consider the allegations of the complaint as true. The factual attack, however, differs greatly for here the trial court may proceed as it never could under 12(b)(6) or Fed.R.Civ.P. 56. Because at issue in a factual 12(b)(1) motion is the trial court's jurisdiction—its very power to hear the case—there is substantial authority that the trial court is free to weigh the evidence and satisfy itself as to the existence of its power to hear the case. In short, no presumptive truthfulness attaches to plaintiff's allegations, and the existence of disputed material facts will not preclude the trial court from evaluating for itself the merits of jurisdictional claims. Moreover, the plaintiff will have the burden of proof that jurisdiction does in fact exist.

*Mortensen v. First Federal Savings & Loan Association,* 549 F.2d at 891. Accordingly, dismissal for lack of subject matter jurisdiction prior to trial, and certainly prior to giving the plaintiff ample opportunity for discovery, should be granted sparingly. *Hospital Building Co. v. Trustees of Rex Hospital,* 435 U.S. 738, 746–47, 96 S.Ct. 1848, 48 L.Ed.2d 338 (1976).

This, of course, is not to suggest that a district court may never dismiss an antitrust suit for lack of subject matter jurisdiction. Where adequate time is given to complete discovery and all the jurisdictional facts are fully developed and placed before the court during an adversary hearing, a district court may, in a clear-cut case, dismiss an antitrust suit for lack of subject matter jurisdiction. *See Rosemound Sand & Gravel Co. v. Lambert Sand & Gravel Co.,* 469 F.2d 416, 418 (5th Cir. 1972). But the present case does not involve such a situation. Here, the purchasers' discovery had barely begun at the time of the preliminary hearing.[20] With the facts not fully developed, a fair and conclusive resolution of the jurisdictional issue cannot be made at this stage of the proceedings. We again emphasize that the preferred procedure in cases such as the present one, where the jurisdictional issue is inextricably bound up with the merits, is to defer resolution of the jurisdictional question to a consideration of the merits.[21] Even though the purchasers were ill-prepared for the hearing, they were nonetheless able to present sufficient facts, in our opinion, to stave off the jurisdictional attack.[22]

## IV. THE MERITS

 Century Village urges this Court to decide two issues which go to the merits of the case. First, it is argued that the condominium unit and the recreational facilities lease in question constitute but one product; Century Village maintains that both are simply part of the "leisure living" package which a purchaser agrees to buy. And second, in a related argument, Century Vil-

---

**20.** Regardless of whether the purchasers are to be faulted for a lack of diligence in pursuing discovery, it is undisputed that discovery was only partially complete at the time of the preliminary hearing. From the time the district court's July 1 Order of Dismissal was received until the record was closed on July 19, 1976, the purchasers had only thirteen days in which to complete discovery. And from all appearances, the purchasers had no idea that their lawsuit was headed toward such a precipitous

termination until they received notice of the preliminary hearing on July 6, 1976.

**21.** Our decision that the allegations and evidence presented were sufficient, at this stage of the lawsuit, to defeat a dismissal for lack of subject matter jurisdiction renders superfluous a discussion of the issues raised by appellants in Arguments IV, V, VII, and VIII.

**22.** *See* the discussion in part II, *supra.*

lage maintains that there is no "tied market" because the recreational facilities are so unique that no comparable facilities can truly be said to be in competition with them.

The first argument interests us.[23] At one end of the spectrum, we feel certain that the requirement that purchasers of condominiums also buy an undivided interest in certain common areas does not involve two separate products. At the other end of the spectrum, however, it would clearly be improper to require condominium purchasers to patronize, for example, a local shopping center owned by the condominium developers; in this hypothetical situation, two separate products are clearly involved. Somewhere in between these two extremes the line between which products constitute part of the condominium "leisure living" package and which products are separate must be drawn. We are unable to do so at this juncture in the present case, however.

A decision on these two issues would clearly be premature at this stage of the proceedings. See *Miller v. Granados*, 529 F.2d 393, 396 (5th Cir. 1976). The issue presently before us is the propriety of the district court's order dismissing the purchasers' lawsuit for lack of subject matter jurisdiction; the trial court's dismissal was not based upon a decision on the merits.[24] Moreover, with discovery only partially underway, the facts are not sufficiently devel-

oped to permit a determination as to whether two separate products are involved in the present case. That determination can only be made on the basis of a fully developed record.

## V. OTHER ISSUES

Appellants raise two remaining issues[25] which we must decide. First, appellants object to the district court's order dismissing the Chatham, Kent, Northampton and Sussex Condominium Associations as parties plaintiff because they "lack standing to maintain an action against condominium developers for an alleged unlawful tie-in in violation of the Sherman Antitrust Act and the Clayton Act." In our decision in *Buckley Towers Condominium, Inc. v. Buchwald*, 533 F.2d 934 (5th Cir. 1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 571 (1977), decided on facts essentially identical to those in the present case, we held there that a condominium association lacks standing to maintain a class action on behalf of its members under the antitrust statutes. We are bound by the *Buckley* opinion; accordingly, we affirm the dismissal of the condominium associations as parties plaintiff.

Second, appellants object to the district court's decision to consolidate the four treble damage actions[26] against Century Village. Fed.R.Civ.P. 42(a)[27] allows the

---

**23.** This is not the first occasion that this Court has been faced with this issue. *Compare Buckley Towers Condominium, Inc. v. Buchwald*, 533 F.2d 934, 938 (5th Cir. 1976), *cert. denied*, 429 U.S. 1121, 97 S.Ct. 1157, 51 L.Ed.2d 571 (1977), *with Imperial Point Colonnades Condominium, Inc. v. Mangurian*, 549 F.2d 1029, 1031 n.1 (5th Cir.), *cert. denied*, 429 U.S. 859, 98 S.Ct. 185, 54 L.Ed.2d 132 (1977).

**24.** On September 26, 1976, the district court entered an order denying appellees' 12(b)(6) motion to dismiss the purchasers' complaint for failure to state a claim upon which relief could be granted.

**25.** Appellants raise another point which we do not reach at this time. Appellees filed counterclaims seeking the recovery of attorney's fees for defending against appellants' antitrust claims. On January 30, 1976, the district court entered an order denying appellants' motion to

dismiss the counterclaims. Notwithstanding the fact that the Order of Dismissal on August 9, 1976, did not award appellees any attorney's fees, appellants argue that the district court erred in failing to grant their motion to dismiss the counterclaims. We need not decide the issue. Should the district court, after further proceedings upon remand, decide to award attorney's fees, then appellants may challenge the propriety of that decision on appeal.

**26.** *See note 1, supra.*

**27.** Fed.R.Civ.P. 42(a) provides:
When actions involving a common question of law or fact are pending before the court, it may order a joint hearing or trial of any or all the matters in issue in the actions; it may order all the actions consolidated; and it may make such orders concerning proceedings therein as may tend to avoid unnecessary costs or delay.

district court to consolidate actions involving common questions of law or fact; here, the four actions involve questions of law and fact which are identical. It is well-settled that the decision to consolidate "is entirely within the discretion of the district court as it seeks to promote the administration of justice." *Gentry v. Smith*, 487 F.2d 571, 581 (5th Cir. 1973). In the absence of any claim of prejudice, we uphold the district court's decision to consolidate the cases.

## VI. CONCLUSION

In summary, we (1) affirm the district court's order dismissing the condominium associations as parties plaintiff; (2) affirm the district court's decision to consolidate the four antitrust actions; and (3) reverse the district court's order dismissing appellants' antitrust claims for lack of subject matter jurisdiction, and remand the case for further proceedings not inconsistent with this opinion.

AFFIRMED in part; REVERSED and REMANDED in part.