The INGALLS IRON WORKS COMPA-
NY, Plaintiff-Appellant,

v.

FRUEHAUF CORPORATION,
Defendant-Appellee.

No. 73–3943.

United States Court of Appeals,
Fifth Circuit.

Sept. 4, 1975.

John D. Clements, C. V. Stelzenmuller, Birmingham, Ala., for plaintiff-appellant.

M. Camper O'Neal, Lawrence Dumas, III, Birmingham, Ala., for defendant-appellee.

Before BROWN, Chief Judge, and BELL and MORGAN, Circuit Judges.

JOHN R. BROWN, Chief Judge:

This is a contract action brought by The Ingalls Iron Works Company (Ingalls), an Alabama subcontractor supplying structural steel, against Fruehauf Corporation (Fruehauf), a Michigan Cor-

poration constructing a building in Alabama, for the $10,556.56 balance due on the purchase order and for $6,965.00 due for extra work performed. Without a trial the District Judge found that a novation transferring to the general contractor both the rights and contract duties of Fruehauf vis-a-vis Ingalls had been effected by the parties and granted Fruehauf's motion for summary judgment. Because the contract language itself and the affidavits submitted by the parties create a genuine issue as to one if not more material facts in the case, we find that summary judgment was inappropriate and reverse.

■ At the time judgment was rendered, the District Judge had before him the pleadings, the contract provision, the affidavits and counter affidavits offered by the parties. To support the judgment on appeal, the same materials must be sufficient to eliminate altogether the likelihood that the material allegations of Ingalls' complaint are true or that there are unresolved questions of fact in Fruehauf's defense of novation. F.R. Civ.P. 56; *Guidry v. Continental Oil Co.,* 5 Cir., 1965, 350 F.2d 342; *Smoot v. State Farm Mutual Automobile Ins. Co.,* 5 Cir., 1962, 299 F.2d 525.

Looking at the case then from the view most favorable to Ingalls, the evidence demonstrated that Fruehauf sought bids on the structural steel components prior to letting the general contract. Specifically, an Invitation to Bid was issued [1] containing this provision:

### INVITATION TO BID

You are invited to submit a proposal to perform work for the complete Fruehauf Division, Sales and Service Building. . . .

Sealed bids are to be delivered or postmarked no later than midnight *May 29, 1969.* . . .

Contract documents will be written with the General Contractor listed as Prime Contractor. The Structural Steel, Steel Joists, Metal Decking, Plumbing, Heating, Ventilating, Sprinklers, and similar other trades needed for the performance of all phases of the work, will be considered as Subcontractors. The Prime Contractor *will be held responsible* for performance of all Subcontractors; excepting the Subcontractor for structural steel, steel joists, metal decking and miscellaneous iron *unless the responsibilities of this Subcontractor are assigned* to the General Contractor under conditions cited on Page 1B–2. The Prime Contractor will handle all negotiations directly with the Owner. . . .

In the interest of expediting the availability of Structural Steel, Steel Joists, Metal Decking and Miscellaneous Iron, the Owner is awarding a separate contract for these materials. The contract for this work *is to be assigned, if the Owner elects to do so,* to the successful bidder, after opening the bids for general construction. The successful bidder will then include this supplier as one of his Subcontractors and will thereafter *be responsible for all aspects of this work* as though he had negotiated directly with the supplier involved. The cost, if any, for inclusion of this Subcontractor's work into the General Contract Work is to be included in the basic proposal for performing all aspects of the work.

The name of the successful structural steel contractor will be forwarded directly to each General Contractor immediately upon award of the structural steel contract. [Emphasis added.]

In accepting the quoted bid of Ingalls, Fruehauf replied with a purchase order that included this provision:

In accordance with the bidding specifications, *this order may be assigned* to the General Contractor at the Owners [sic] option. *You will be formally ad-*

---

1. In its challenge to the validity of Fruehauf's affidavit offered in support of its motion for summary judgment, Ingalls urges that there is no indication that this precise Invitation to Bid was *in fact* communicated to Ingalls. The affi-davit offered by Joseph Reinholz, Fruehauf's chief construction inspector, states that "I understand that" a copy of this Invitation was sent to Ingalls.

*vised of the Owners [sic] decision on this item very shortly.*

However, the boilerplate provisions of the purchase order contained a non-assignment clause.[2] Lastly, the purchase order contract contained payment terms that required payments to be made monthly less retainage with final payment on acceptance and receipt of all releases.[3]

Ingalls agreed to the purchase order dated April 23, 1969 and was operating under it when Fruehauf let the general contract on September 8, 1969 to Earl A. Boudrow & Sons (Boudrow).[4] As the Invitation for Bids contemplated, Boudrow's bid included an express willingness for the assignment to it of Ingalls' structural steel contract for which it was to receive a 5% override.[5] And responsively, the general contract contained its own language of prospective assignment,[6] although Ingalls was never formally advised by Fruehauf that the steel contract had been assigned to Boudrow despite the language prescribing that formal notice would be given at the time of assignment to the general contractor.

But Ingalls for all practical purposes recognized the appointment of the general contractor and throughout September and October—while the structural work was drawing to completion—Ingalls invoiced Fruehauf and Boudrow jointly. These invoices were sent to Fruehauf's home office in Detroit. Ingalls asserts that these invoices exclude any possibility that it intended to release Fruehauf and create a novation with Boudrow.

In response Fruehauf submitted to the Court copies of two mechanics lien releases[7] issued by Ingalls to Fruehauf.

2.          TERMS AND CONDITIONS
            *    *    *    *    *    *
    3. ASSIGNMENT. The contract resulting from the acceptance of this order, any and all moneys that may become due and owing to Vendor hereunder, or any other interest hereunder, shall not be assignable, nor shall all or any substantial part of the performance required by Vendor hereunder be sub-contracted, without prior written consent of Purchaser.

3. Monthly, less 10 percent; *Final 35 days after completion and acceptance by Owner and receipt of all releases and guarantees.*

4. The exact date of the general contract is somewhat uncertain because while Fruehauf signed *on September 8, 1969,* Boudrow did not sign the contract until November 10, 1969—by which time the construction obligations of Ingalls under the subcontract were completed.

5. I (we) agree to the "assignment of subcontracts" in accordance with the specifications and on the basis of the following information:
    (a) Fee for assignment of the subcontract for structural steel and miscellaneous iron work, 5% of the amount of the order.
    Purchase Order No. DE 33854 dated April 23, 1969, awarded to:
    Ingalls Iron Works Company
    620 Fourth Avenue, North
    Birmingham, Alabama
    Amount of Order: $82,830.00

6. The following Purchase Orders *are to be assigned* to the Contractor in accordance with the Specifications and on the basis of a Five (5) percent fee as per the *Original Quotation of June 10, 1969.*

Purchase Order DE 33854 Dated April 23, 1969

Ingalls Iron Works Company
620 4th Avenue South
Birmingham, Alabama    35203

Amount of Purchase Order    $ 82,830.00
Fee for Assignment of P.O.
    (5% of $82,830.00)   ADD    4,141.50
                                 $ 86,971.50

(Emphasis added).

7.      WAIVER OF MECHANICS LIEN

THE UNDERSIGNED, having furnished materials or performed labor for the erection or repair of a certain building owned by Fruehauf Corporation, a Michigan Corporation, said building being described as follows:
    New Sales and Service Branch
    Fruehauf Corporation
    1811 Vanderbilt Road, North
    Birmingham, Alabama
DO HEREBY waive and release any right we may have to file a mechanics or artisans or any similar lien against the said building or against Fruehauf Corporation, or to present any claim for said materials furnished or labor performed to date to Fruehauf Corporation, except for retainage.
Given this *3rd* day of *October, 1969* in the City of *Birmingham* County of *Jefferson* State of *Alabama.*
        INGALLS IRON WORKS
        /s/W. E. McCaddon (L.S.)
        W. E. McCaddon, Manager
        Contract Administration

Fruehauf contends that these releases demonstrate Ingalls' assent to the novation.

To counter this argument, Ingalls points to the contract terms (see note 3, *supra* ) requiring the final payment to be made after the owner had received "all releases." This provision made such releases a precondition to final payment. Furthermore, Ingalls contends that Alabama law requires the Courts to look further than the mere mechanics lien releases to determine the intent of the parties.[8] And a formal release expressly required as a precondition to payment which on that hypothesis was still unpaid could not have the effect of extinguishing the debt for which the release was exacted. See also *Mitchell v. Cobb*, 270 Ala. 346, 118 So.2d 918 (1960). At least it would present questions of fact.

Cumulatively, Ingalls argues that the evidence suggests at most contract transactions that as a matter of law were never intended by the parties to shift the contract obligations of Fruehauf to Boudrow and create thereby a novation. While it is unnecessary at this stage to go that far, at the least the evidence shows issues of fact that make this an inappropriate case for summary judgment.

■ A novation is a contract to substitute one debtor for another. It is determined in the same manner as any other contract—from the total facts and circumstances of the transaction.[9] Essentially, to create a novation, the creditor must affirmatively acknowledge the extinction of the old debt and the substitution of the newly obligated party.[10] Mere assignment of the obligation from one debtor to another even with the creditor's knowledge of that assignment will not suffice to release the original debtor unless there is the crucial intent to substitute.

■ To support a summary judgment, then, the District Judge had to be able to conclude from all the available facts of the case a clear intent by Ingalls to permit Fruehauf to shift its clear contract liability to Boudrow. Whatever inferences one may draw from the course of dealings between the parties, the evidence offered by the parties to this construction contract simply is not so unequivocal as to support this kind of summary resolution as a matter of law. On this record the facts in the form presented called for a determination by a trier of the fact.

We do not forecast what may be the outcome of this case or indeed whether it will call for a full blown trial. It may well be that at the end of Ingalls' case-in-chief, the District Judge may conclude that a directed verdict or its non-jury equivalent if the Judge makes credibility findings, see F.R.Civ.P. 41(b), is in order.[11] But until there is a factual de-

The second waiver dated November 10, 1969 was identical to the first except that the mechanics lien on the retainage was waived as well.

8. Alabama Code, Title VII, § 381 provides:

§ 381. *Effect of written releases and receipts.*—All receipts, releases, and discharges in writing, whether of a debt of record, or a contract under seal, or otherwise, must have effect according to the intention of the parties thereto.

9. *Copeland v. Beard,* 217 Ala. 216, 115 So. 389 (1928); 2 Williston 3rd § 353 (1959).

10. Apparently the creation of a novation under Alabama law does not entirely eliminate the creditor's right of recourse against the original debtor. See *Copeland v. Beard, supra,* 115 So. at 390–91 where the Supreme Court of Alabama, citing numerous cases, notes that the original debtor becomes a quasi surety who may remain liable if the creditor elects to sue him.

11. As we have stated previously, "once the matter gets beyond what the lawyers in legalese say the facts are and the Court sees what the real facts are, it may well wash out on summary judgment, . . . or if not then, then later on motion for directed verdict after the plaintiff's or all of the evidence is in." *Tyler v. Peel Corp.,* 5 Cir., 1967, 371 F.2d 788, 792. We have noted that "[t]here may be cases, and this is one, in which a determination that there is a 'reasonable doubt' . . . about the existence of a genuine controversy does not foreclose a directed verdict if on the evidence as it is actually and finally adduced on a trial reasonable minds could not reach a

termination by a trier of fact making fact decisions—not legal decisions—that the proffered evidence is or is not sufficient as a matter of law, we say only that as the case comes to us now the District Judge may not cut the gordian knot with F.R.Civ.P. 56.

Reversed and remanded.

contrary conclusion." *Robbins v. Milner Ent., Inc.,* 5 Cir., 1960, 278 F.2d 492, 496. It also bears repeating that "[t]he utility of this marvelous instrument of summary judgment is not lessened or its importance weakened because it has limitations. Certainty, or predictable certainty, if not actually unobtainable, is often an illusion in the complex variables which pass through a courthouse door. The rules contemplate that a judge can take a first and a second and a third and a final look. It is the predictable *uncertainty* which sometimes makes this necessary. But that is a part of the process by which controverted facts are resolved and, occasionally, facts apparently controverted are established to be uncontradicted in fact." *Id.* at 497 (footnote omitted). See also *Webb v. Standard Oil Co.,* 5 Cir., 1969, 414 F.2d 320, 324; *Braniff v. Jackson Ave.-Gretna Ferry, Inc.,* 5 Cir., 1960, 280 F.2d 523, 528–29.