841 F.2d 651
 1988-1 Trade Cases 67,955, 10 Fed.R.Serv.3d 1173
 Joseph SCIAMBRA d/b/a Periodical Marketing and Consulting
Company, Plaintiff- Appellant Cross-Appellee,
v.
GRAHAM NEWS COMPANY, et al., Defendants,
ARA Services, Inc., Defendant-Appellee Cross-Appellant.
 No. 86-3501.
 United States Court of Appeals,
Fifth Circuit.
 April 8, 1988.
Rehearing and Rehearing En Banc Denied May 17, 1988.
 
 Charles K. Reasonover, Deutsch, Kerrigan & Stiles, New Orleans, La., for plaintiff-appellant cross-appellee.
 James A. Babst, Harry McCall, Jr., Chaffe, McCall, Toler & Sarpy, New Orleans, La., for defendant-appellee cross-appellant.
 Appeals from the United States District Court for the Eastern District of Louisiana.
 Before TIMBERS,* KING,** and HIGGINBOTHAM, Circuit Judges.
 TIMBERS, Circuit Judge:
 
 
 1
 Joseph Sciambra d/b/a Periodical Marketing and Consulting Company ("Sciambra") appeals from a default judgment entered February 20, 1987 in the Eastern District of Louisiana, Marcel Livaudais, Jr., District Judge. The court imposed, pursuant to Fed.R.Civ.P. 37, a sanction in the form of a default judgment against ARA Services, Inc. ("ARA"), Sciambra's former supplier. The court awarded Sciambra damages based on his antitrust complaint. The court subtracted from its damage award the amount of a settlement between Sciambra and ARA's alleged coconspirator, the purchaser of ARA's business. The court then trebled that figure.
 
 
 2
 On appeal, Sciambra claims that the initial award should have been trebled before the amount of the settlement was deducted. ARA cross-appeals, claiming that the court (1) erred in imposing a default judgment under Rule 37; (2) lacked subject matter jurisdiction by virtue of the settlement; (3) erred in its assessment of damages; and (4) should not have trebled damages based on the default judgment.
 
 
 3
 We hold that the court had jurisdiction and we affirm the Rule 37 default judgment as a sanction. We reverse and remand, however, solely on the issue of damages, holding that the court erroneously based its calculations on the going concern value of Sciambra's business although he had sold it. On remand on the issue of damages, moreover, we instruct the district court to treble the award before deducting the amount paid in settlement by the alleged coconspirator.
 
 I.
 
 4
 We shall summarize only those facts and prior proceedings believed necessary to an understanding of the issues raised on appeal.
 
 
 5
 Sciambra distributed primarily magazines to retailers in the New Orleans area. He obtained his supply from ARA, a wholesaler and competitor distributor of books and periodicals. ARA is the largest book and magazine distributor in the United States. Although ARA initially provided some retail accounts to Sciambra, he operated an independent business and had solicited and obtained the majority of his accounts. Metro News Agency ("Metro News") also was a wholesaler and competitor distributor in the New Orleans area. Graham News Company, Metro News and Bayou News Agency, Inc. (collectively "Graham") had substantially identical ownership and management.
 
 
 6
 In late 1983 or early 1984, representatives of Graham discussed with ARA the possibility of purchasing ARA's business in New Orleans. During several meetings between their representatives, Graham told ARA that it did not want to assume ARA's contract with Sciambra. ARA agreed to terminate Sciambra's source of supply prior to the sale of its business to Graham. It gave Sciambra 30 days notice of termination on March 19, 1984.[1]
 
 
 7
 On March 16, ARA and Graham executed a sales agreement whereby ARA sold its business to Graham for $2,799,065. The sales price was based on 65% of ARA's annual net sales. Apparently the value of a periodical business typically ranges from 10% to 100% of annual sales. Actual delivery of assets was to take place on April 2. ARA arranged for Graham to service Sciambra on the same terms as ARA had serviced him until April 18, pursuant to the notice of termination. After April 18, neither ARA nor Graham would supply Sciambra. Included in the total sales price paid by Graham for ARA's business was an amount expressly allocated for ARA's annual sales to Sciambra. The parties determined this amount to be $255,632, based on 65% of ARA's annual net sales to Sciambra.
 
 
 8
 Paragraph 2.1(c) of the sales agreement provided:
 
 
 9
 "The contract between Seller [ARA] and Joe Sciambra is not being assumed by Buyer [Graham], provided that both Buyer and Seller agree that sales by Seller to Joe Sciambra, Cash Route Operator, shall be included within the Aggregate Net Sales referred to in Section 2.1(a) to calculate the Purchase Price."
 
 
 10
 Sciambra's business was the only account separately allocated in the agreement. During the course of negotiating the sale, both parties discussed potential antitrust concerns. Graham attempted to obtain from ARA an indemnity agreement covering any antitrust violations asserted by Sciambra. ARA would not agree to such a condition. After April 18 when Graham refused to supply products to Sciambra, Graham became the only wholesaler of books and periodicals in the New Orleans area.
 
 
 11
 On April 16, Sciambra commenced the instant action against Graham and ARA, alleging antitrust violations under Secs. 1 and 2 of the Sherman Act, and Secs. 4, 7, and 16 of the Clayton Act, as well as breach of contract claims under state law. The complaint alleged basically that ARA and Graham had conspired to restrain trade and to monopolize the wholesale distribution of periodicals in the Greater New Orleans market; and, for the purpose of eliminating him as a competitor, that they had refused to supply Sciambra with goods. Sciambra requested injunctive relief and $255,632 in damages (the amount Graham and ARA allocated in their sales contract for his business), the damages to be trebled.
 
 
 12
 On June 29, Judge Feldman, to whom the case temporarily was assigned, granted Sciambra a mandatory preliminary injunction against Graham based on a showing of probable violation of Sec. 2 of the Sherman Act. The injunction required Graham to supply periodicals to Sciambra. The injunction was not granted against ARA, who no longer was in the periodical business in New Orleans. Graham began supplying Sciambra. Sciambra went back in business on about July 1. There were a total of approximately 70 days during which Sciambra lacked supplies before the injunction was entered.
 
 
 13
 Subsequently, on September 12, Sciambra and Graham entered into a sales contract. The contract provided that Graham would purchase Sciambra's business for the recited consideration of $40,000. In connection with the sale, Sciambra and Graham entered into an undated non-competition agreement pursuant to which Sciambra agreed to refrain from commercial activity for seven years within one hundred miles of any retail account in South Louisiana serviced by him in 1983 or 1984.
 
 
 14
 On September 20, Sciambra and Graham entered into a settlement agreement, releasing Graham from any alleged antitrust violations asserted by Sciambra, for the sum of $125,000. Apparently, the sale and the settlement (collectively the "Graham sales settlement") were agreed upon at the same time. Pursuant to the agreement, Sciambra ceased operations in October. ARA was not a party to that agreement.
 
 
 15
 The instant action continued against ARA. A total of ten court orders were entered by Magistrate Fonseca and Judge Livaudais to enforce discovery against ARA. Shortly before trial, the court determined that numerous discovery abuses by ARA made a fair trial impossible. On March 7, 1986, the court, pursuant to Fed.R.Civ.P. 37(b)(2)(C) and (E), imposed sanctions against ARA consisting of a default judgment, costs and attorney's fees for repeated failures to comply with court-ordered discovery.
 
 
 16
 After trial on the issue of damages, the court, in its June 4, 1986 order, awarded $255,632 in damages against ARA, based on what the court perceived as the market value of the business--that which a willing seller and a willing buyer would pay--as evidenced by the ARA/Graham sale allotting $255,632 for Sciambra's business. Although Sciambra offered his business to both ARA and Metro News for $100,000 when his supply was being terminated and he could not find an alternative source, the court held that it was hardly an "arms length" negotiation. The court subtracted the $165,000 Graham sales settlement from the $255,632 damages. Although the court initially did not permit trebling, it subsequently entered an amended order on February 20, 1987 and trebled the $90,632 damage award. The result was an award of $271,896 in damages, plus attorney's fees of $69,414.72 and costs of $8,085.95.
 
 
 17
 From the judgment entered on that order the instant appeal has been taken.
 
 II.
 
 18
 We turn first to ARA's claim that the court abused its discretion in imposing a sanction in the form of a default judgment. ARA asserts that the court's findings of fact on which it based its sanction are unsupported by the record. We disagree.
 
 
 19
 A district court has discretion to impose sanctions under Rule 37. Judgment by default, although a harsh sanction, is one contemplated by the Rule. We will reverse a determination that sanctions are warranted only if the district court has abused its discretion. National Hockey League v. Metropolitan Hockey Club, Inc., 427 U.S. 639, 642-43 (1976) (per curiam); Batson v. Neal Spelce Ass'n, Inc., 765 F.2d 511, 514 (5th Cir.1985).
 
 
 20
 Upon our review of the record, we affirm the entry of the judgment by default. The court explained in detail the factors leading to its decision to impose a default judgment. True, the court's findings were drafted by Sciambra and signed by the judge, a practice we disfavor. Amstar Corp. v. Domino's Pizza, Inc., 615 F.2d 252, 258 (5th Cir.1980). But viewing these findings with a more critical eye, we hold that they do not amount to an abuse of discretion.
 
 
 21
 The magistrate had ordered production, among other documents, of all notes from the negotiations leading to the ARA/Graham sale kept by certain ARA officials; certain documents pertaining to ARA's relationship with Sciambra; and documents regarding Sciambra's termination by ARA. ARA complied only partially. It refused to provide most of the documents or claimed that they did not exist--a claim not credited by the court. The court found significant that, although Sciambra and ARA had had a seven year relationship, ARA failed to produce any meaningful documents concerning this relationship or Sciambra's termination. ARA refused to produce documents it claimed were privileged even after the court offered to provide for in camera inspection. ARA did not comply with a number of discovery orders. Moreover, lesser sanctions were tried by the magistrate, but to no avail. The magistrate, in an order entered July 31, 1985, imposed attorney's fees as a sanction for ARA's conduct. In subsequent orders, ARA was warned that further sanctions would follow if noncompliance continued. Finally, the court specifically found a default judgment was warranted because of the prejudice to Sciambra due to the extent and nature of the documents not produced and the "extreme and unwarranted and deliberate delay" in complying with court-ordered production.
 
 
 22
 Based on the record, we hold that the court clearly was within the scope of its authority in imposing a default judgment as a sanction against ARA. The court carefully considered the appropriate alternatives. There was no abuse of discretion whatsoever.
 
 
 23
 We affirm the entry of the default judgment awarding damages in favor of Sciambra, as well as the award of attorney's fees and costs in his favor--all against ARA.[2]
 
 III.
 
 24
 We turn next to ARA's claim that the settlement between Sciambra and Graham divested the court of subject matter jurisdiction.
 
 
 25
 The premise of this argument is that Sciambra's lost profit was negligible and was exceeded by the amount paid by Graham in settlement. ARA asserts, therefore, that there was no justiciable case or controversy. We disagree.
 
 
 26
 ARA relies primarily on the decision of the Supreme Court in Zenith Radio Corp. v. Hazeltine Research, Inc., 401 U.S. 321, 341 (1971), in which the Court reaffirmed well-settled law that an antitrust plaintiff "who has recovered any item of damage from one conspirator may not again recover the same item from another conspirator; the law, that is, does not permit a plaintiff to recover double payment." ARA also cites the Second Circuit decision in Abrams v. Interco, Inc., 719 F.2d 23, 31-34 (2nd Cir.1983). In Abrams an antitrust action was dismissed after the defendant offered to settle with the plaintiff class.
 
 
 27
 We hold that the settlement in the instant case did not result in the court's losing subject matter jurisdiction. At the outset, we find instructive our prior decisions in Green v. Ferrell, 664 F.2d 1292 (5th Cir.1982), and Chatham Condominium Ass'ns v. Century Village, Inc., 597 F.2d 1002, 1011 (5th Cir.1979), although neither decision involved the effect of a settlement. In Green, we held that "[a] plaintiff's failure to state a meritorious cause of action does not defeat subject matter jurisdiction." Green, supra, 664 F.2d at 1294. Particularly when antitrust claims are involved, it is a "well-established principle in this Circuit that premature dismissals ... for lack of subject matter jurisdiction are not favored 'where the factual and jurisdictional issues are completely intermeshed....' " Chatham Condominium Ass'ns, supra, 597 F.2d at 1011 (quoting McBeath v. Inter-American Citizens for Decency Committee, 374 F.2d 359, 363 (5th Cir.), cert. denied, 389 U.S. 896 (1967)).
 
 
 28
 Our holding that the court here had jurisdiction is not contrary to either Supreme Court or Second Circuit precedent. Rather, we believe that ARA ignored both the thrust of the Supreme Court's reasoning in Zenith and the distinguishing facts involved in Abrams.
 
 
 29
 Of primary importance in Zenith was the Supreme Court's directive that the effect of a settlement releasing coconspirators in an antitrust case rests on the intent of the parties. Zenith, supra, 401 U.S. at 345-56. The Court held, applying the intent test, that the plaintiff was entitled to future damages from the defendant, a coconspirator who was not a party to the settlement, despite the settlement. The Court based its holding on a finding that the settlement agreement was understood by the parties to the agreement as compensation only for damages up to the date of the agreement. Id. at 348. In discussing the effect of the settlement, moreover, the Court did not speak in terms of "jurisdiction"; rather, it discussed whether the coconspirator who was not a party to the agreement would be "released" or was entitled to a defense of payment. Id. at 343-48.
 
 
 30
 The Abrams decision, which does discuss the effect of settlement in jurisdictional terms, is readily distinguishable. There, the Second Circuit held that there no longer was a "justiciable controversy" after a sole defendant in an antitrust action offered a plaintiff class comprised of persons who had bought any of defendant's products three times the total amount of their purchases plus reasonable attorney's fees and costs. The effect on a coconspirator was not even at issue. Moreover, unlike the instant case, the amount of potential damages involved in Abrams was quite clear. Finally, there is no doubt that even under Abrams a court must have subject matter jurisdiction in order to make an initial determination of whether the settlement satisfied the relief to which the plaintiff was entitled.
 
 
 31
 In short, we hold that the court in the instant case had subject matter jurisdiction. Accordingly, the court had the authority to impose a default sanction and to assess damages, costs, and attorney's fees. Although the court had jurisdiction, however, under Zenith we still must determine whether ARA had a valid defense of payment for any portion of the damages based on the Graham settlement. Accordingly, we turn now to the issue of damages.
 
 IV.
 
 32
 The court calculated the damages sustained by Sciambra by determining the loss of good will and the loss of the ongoing business. The best evidence of this resale value, the court found, was the price Graham was willing to pay for Sciambra's accounts. ARA disputes both the application of going concern value and the use of the amount alloted in the ARA/Graham contract as a measure of going concern value.
 
 
 33
 As a general rule, going concern value is a permissible alternative to lost profits as a measure of damages for a claim of illegal exclusion from a market. Pierce v. Ramsey Winch Co., 753 F.2d 416, 429 n. 15 (5th Cir.1985); Lehrman v. Gulf Oil Corp., 500 F.2d 659, 663-64 (5th Cir.1974). On the facts of the instant case, however, we hold that the court erred in applying going concern value. Sciambra was not forced out of business by ARA and Graham. The court had granted Sciambra a preliminary injunction which enabled him to continue receiving supplies; prevailing on the merits would have assured his future supplies as well. Rather, Sciambra agreed to settle with Graham and, as part of that settlement he agreed to sell his business and covenanted not to compete with Graham. It appears, therefore, that Sciambra's voluntary sale caused the loss of his ongoing business, not the antitrust violations. Going concern value is an alternative to lost profits as a measure of antitrust damages only in cases where the antitrust victim was actually forced out of business. See Pierce, supra, 753 F.2d at 429; Lehrman, supra, 500 F.2d at 663-64.
 
 
 34
 Accordingly, we reverse the court's determination of damages. We remand with instructions to the district court to proceed in accordance with this opinion, including an examination of the Graham settlement in light of the Zenith intent test and an award of damages limited to profits Sciambra lost during the days he could not operate because of ARA's and Graham's conduct. Since we hold that the court erroneously applied going concern value as the measure of damages, we find it neither necessary nor appropriate to determine whether the court erred in calculating the value of the going concern of Sciambra's business.
 
 V.
 
 35
 We next turn to whether the court erred in deducting the amount of the Graham settlement from the damage award, and then trebling that amount to determine the final judgment against ARA. Once the court on remand determines the proper amount of damages, we agree with Sciambra's claim that the court should treble the amount of the damage award against ARA before deducting the amount of the Graham settlement. In the seminal case of Flintkote Co. v. Lysfjord, 246 F.2d 368, 398 (9th Cir.), cert. denied, 355 U.S. 835 (1957), the Ninth Circuit held that there should be no deduction for settlement until after trebling. "Any other method would have resulted in plaintiffs receiving less than the whole to which they were entitled." Id. at 398. We find no contrary court of appeal authority. E.g., Hydrolevel Corp. v. American Society of Mechanical Engineers, Inc., 635 F.2d 118, 130 (2d Cir.1980), aff'd on other grounds, 456 U.S. 556 (1982); Baughman v. Cooper-Jarrett, Inc., 530 F.2d 529, 534 (3rd Cir.), cert. denied sub nom. Wilson Freight Forwarding Co. v. Baughman, 429 U.S. 825 (1976); Burlington Indus. v. Milliken & Co., 690 F.2d 380, 390 (4th Cir.), cert. denied, 461 U.S. 914 (1983); Semke v. Enid Automobile Dealers Ass'n, 456 F.2d 1361, 1371 (10th Cir.1972). Logically, also, a settlement between a plaintiff and an alleged antitrust coconspirator would take into account that judgment for the plaintiff would result in treble damages.
 
 
 36
 ARA does not dispute the overwhelming authority which supports Sciambra's position. Rather, ARA asserts that trebling a damage award premised on a default judgment imposes an unjustified sanction. We disagree.
 
 
 37
 ARA assumed the risk in disobeying discovery orders that the court would direct a default judgment in this antitrust action where damages are trebled by law. See Televideo Systems, Inc. v. Heidenthal, 826 F.2d 915 (9th Cir.1987). Moreover, we will not permit ARA to profit from its contumacious behavior. Had the court not felt compelled to impose sanctions and had the trial culminated in a judgment for Sciambra, damages would have been trebled. We will not deny an antitrust plaintiff treble damages when a defendant's dilatory behavior leads the court to impose judgment by default.
 
 VI.
 To summarize:
 
 38
 We affirm the district court's default judgment in imposing as a Rule 37 sanction an award to Sciambra of damages, attorney's fees, and costs.
 
 
 39
 We reverse and remand on the issue of damages. When Sciambra sold his business to Graham, he no longer could recover going concern value from ARA. We instruct the district court on remand to limit damages to the profits Sciambra lost and to treble damages before deducting any amount paid by Graham in settlement.
 
 
 40
 AFFIRMED IN PART; REVERSED IN PART AND REMANDED.
 
 
 
 *
 Of the Second Circuit, sitting by designation
 
 
 **
 Formerly Carolyn Dineen Randall
 
 
 [1]
 Unless otherwise stated, all dates in this summary of the facts and prior proceedings are in the year 1984
 
 
 [2]
 See a recent Second Circuit opinion, Update Art, Inc. v. Modiin Publishing Ltd., 843 F.2d 67, 70 (1988), affirming summary judgment awarding $475,406 damages as a Rule 37 sanction against defendants for repeated bad faith noncompliance with discovery orders in a copyright infringement action