**NISSHO–IWAI AMERICAN CORPORA-TION, Plaintiff-Appellee,**

**v.**

**R. Sukarno KLINE, Individually and d/b/a Frankenburg Import–Export Ltd., Defendants-Appellants.**

No. 87–2902.

United States Court of Appeals, Fifth Circuit.

May 31, 1988.

Opinion on Denial of Rehearing July 5, 1988.

Howard R. Birnbach and Martin Sulkow, New York City, for R. Sukarno Kline and Frankenburg Import-Export.

Paul E. Galvin, Kathleen J. St. John, Dallas, Tex., for plaintiff-appellee.

Before POLITZ, KING and SMITH, Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In this appeal from a final judgment incorporating a partial summary judgment on the issue of liability, appellants Rukmini Sukarno Kline and Frankenburg Import-Export Ltd. contend that the court below abused its discretion in not reinstating their pleadings, stricken by a state court prior to removal of this case. Appellants also assert—contrary to a finding below—that evidence in the record is competent to raise issues of material fact precluding summary judgment. We AFFIRM.

## I.

Appellant Rukmini Sukarno Kline ("Kline") was sole owner of appellant Frankenburg Import-Export Ltd. ("Frankenburg-Kansas"), a Kansas corporation registered in Mexico as a middleman-supplier of steel products to that country. In December 1978, Petroleos Mexicanos ("Pemex") accepted Kline's bid to supply Pemex with some 93,000 meters of steel oil field pipe, and in March 1979 forwarded Frankenburg-Kansas a purchase order (hereinafter "the Pemex purchase order") requesting various types and quantities of pipe for which Pemex was willing to pay approximately $5.2 million.

To obtain assistance in locating a manufacturer of pipe for resale to Pemex, Kline entered into an agreement with Aston Oilfield Supply Co. ("Aston") and its principals, Richard Neal, Cliff Douglas, and Bud Franklin ("the Aston group"). Under this agreement, Aston and Kline each became fifty percent owners of Frankenburg Import-Export Limited ("Frankenburg-Cayman"), a Cayman Island corporation formed to locate a supplier to fill the Pemex purchase order.

In February 1980, after Pemex agreed to a price increase consonant with world market prices, negotiations between the Aston group and representatives of appellee Nissho-Iwai American Co. ("Nissho") resulted in a sales confirmation agreement according to which Nissho contracted to sell 92,000 meters of pipe to Frankenburg-Cayman for approximately $5.6 million. This agreement was made contingent on a direct payment arrangement that would be consummated between Pemex and the Bank of Tokyo, where Nissho was a customer.

In June 1980, a direct payment arrangement was finalized between Nissho, Pemex, and Richard Neal on behalf of Frankenburg-Cayman. This so-called "Lock Box Agreement" provided that Pemex would issue a $5.6 million company check made payable to Frankenburg-Cayman's order and send it to a lock box in New York under the control of the Bank of Tokyo Trust Company.

In the meantime, Kline sent a letter to the Bank of Tokyo Trust Company authorizing it to collect Pemex's check and to credit the proceeds to Nissho's account. She also executed an Assignment and Security Agreement on behalf of Frankenburg-Kansas, granting Nissho a security interest in monies she might receive from Pemex pursuant to the Pemex purchase order. This Security Agreement further provided that she would receive such payment as "trustee" for Nissho and deliver it immediately thereafter "without commingling."

Throughout June 1980, Nissho shipped the pipe to Veracruz and delivered the original bills of lading and other shipping documents to Frankenburg-Cayman. These documents were forwarded to Pemex on June 26. Before Pemex could issue the check, however, and without the knowledge of Nissho, Kline sent a letter to the Houston office of Pemex instructing Pemex to make its check payable to Frankenburg-Kansas and to hold it for her to pick up personally. She also demanded possession of the shipping documents representing title to the pipe. Pemex responded that it was bound under the Lock Box Agreement to send the check to New York, and could not do otherwise without first receiving joint instructions from Nissho and Frankenburg-Cayman. Kline thereupon insisted that the original Pemex purchase order had been issued to Frankenburg-Kansas, making her company its sole owner.

Pemex capitulated. On August 7, 1980, a check for $5,584,392.04 was issued payable to Frankenburg-Kansas, and the shipping documents were placed at Kline's disposal. On August 8, Kline went to Pemex's Houston office, took possession of the documents, and exchanged them for the check. She deposited it in Frankenburg-Kansas's account with Chase Manhattan Bank in New York and promptly withdrew the proceeds. Approximately $1.5 million she later spent as her personal funds, and the rest she secreted in an as-yet-undisclosed Lichenstein or Swiss bank.

This lawsuit ensued. In January 1981, Nissho filed its petition in Texas state district court alleging counts against Kline for breach of contract, fraud, and misappropriation of trust funds. The significant aspect of the state court proceedings for purposes of this appeal is the state judge's December 7, 1981, order striking Kline's defenses and counterclaims in their entirety as a sanction for abusing the discovery

process. Kline twice moved the state court to reinstate her pleadings, which motions were denied.

In August 1982, Pemex was impleaded as a third party defendant and removed the case to federal district court. The following month, Kline moved to amend (i.e., reinstate) her pleadings. Before the court could rule on this motion, Nissho moved for partial summary judgment on grounds that presupposed reinstatement of all of Kline's defenses. Nissho argued, among other things, that Kline had incurred liability for the amount of the check proceeds under both the sales confirmation and security agreements. In reply to Kline's response to Nissho's motion, Nissho objected to Kline's affidavit—the linchpin of her summary judgment proof—as unsworn.

In October 1983, the court granted Nissho's motion from the bench and, in a written order dated July 5, 1984, declared as its rationale "the reasons stated in plaintiff's moving papers." Meanwhile, Kline's motion to file an amended answer was postponed to enable the parties to rebrief the issue; this motion was subsequently denied on December 1, 1983. The case then proceeded to trial on the issue of damages, resulting in a money judgment for Nissho.[1]

In its brief, Nissho correctly points out that appellants cannot secure a reversal in this case unless we determine (1) that the district court abused its discretion in not permitting appellants to reinstate their defenses, *and* (2) that such defenses, if reinstated, raise issues of material fact precluding summary judgment. Since we now hold that the district court did not abuse its discretion and that appellants' summary judgment proof is incompetent, we affirm the judgment of the district court without reaching the merit of appellants' defenses.

---

1. The remaining parties had settled prior to trial: Nissho agreed to dismiss its claims against Franklin, Neal, Whalen, and Douglas; Aston International, Inc., and Aston Oilfield Supply, Inc., agreed to entry of judgment against them in favor of Nissho. In its Final Judgment of July 24, 1987, the court awarded Nissho, against Kline, Frankenburg-Kansas, Frankenburg-Cayman, and the two Aston companies, $5,584,-392.04 in actual damages; $535,000.00 in attorneys' fees; and $4,703,080.24 in pre-judgment interest, for a total of $10,822,472.28 plus post-judgment interest. Only Kline and Frankenburg-Kansas filed the instant appeal from the Final Judgment below.

## II.

One issue raised by this appeal is whether any deference is owed to an interlocutory state court order once a case has been removed to federal court. In determining not to permit appellants to reinstate their stricken pleadings, the district court deferred to the state court's imposition of such sanction as being "supported by the record." Additionally, the district court considered itself bound to do so by the "spirit and letter" of both 28 U.S.C. § 1450 and the Supreme Court's interpretation thereof in *Granny Goose Foods, Inc. v. Brotherhood of Teamsters,* 415 U.S. 423, 94 S.Ct. 1113, 39 L.Ed.2d 435 (1974). Language in the *Granny Goose Foods* opinion figuring prominently in the district court's analysis states that section 1450 was designed to ensure "that interlocutory orders entered by the state court that protect the various rights of the parties will not lapse upon removal." 415 U.S. at 437, 94 S.Ct. at 1123. The question here, however, is not whether the order will lapse during transition from state to federal court, but rather, whether its origin in state court sets it apart from any interlocutory order a federal court may decide to reconsider.

For reasons stated below, we decline to read section 1450 as imposing comity restraints, and we thus agree with Kline that *Granny Goose Foods* mandates no predetermined level of deference which a federal court must observe in reconsidering an interlocutory state court order. However, we do not accept Kline's conclusion that the federal court abuses its discretion whenever, as was done below, it permits the state court order to stand on the basis of the record developed by the state court.

■ Interlocutory state court orders are kept in force upon removal of a case to federal court by 28 U.S.C. § 1450, which in pertinent part states:

Whenever any action is removed from a state court to a district court of the United States ... [a]ll injunctions, orders, and other proceedings had in such action shall remain in full force and effect until dissolved or modified by the district court.

In *Granny Goose Foods,* the Supreme Court interpreted section 1450 to give interlocutory state court orders no greater "force and effect" than they would have obtained had the case remained in state court. 415 U.S. at 436–37, 94 S.Ct. at 1122–23. Rather, by ensuring these orders do not lapse upon removal, the statute facilitates the federal court's taking the case up "where the state court left it off." *Id.* at 437, 94 S.Ct. at 1123 (quoting *Duncan v. Gegan,* 101 U.S. (11 Otto) 810, 812, 25 L.Ed. 875 (1882)). The federal court accepts the case in its current posture "as though everything done in state court had in fact been done in the federal court." *Savell v. Southern Ry.,* 93 F.2d 377, 379 (5th Cir.1937) (construing *Duncan v. Gegan*). In the end, judicial economy is served by eliminating the need for duplicative proceedings in federal court. *Granny Goose Foods,* 415 U.S. at 436–37, 94 S.Ct. at 1122–23.

Accordingly, where as in the present case the state court's ruling is purely interlocutory, it remains subject to reconsideration just as it had been prior to removal. *General Investment Co. v. Lake Shore & Michigan Southern Ry.,* 260 U.S. 261, 267, 43 S.Ct. 106, 110, 67 L.Ed. 244 (1922). "Had the cause remained in the state court the power to reconsider would have been in that court, but when the removal was made the power passed with the cause to the District Court." *Id.*

■ On the other hand, it is well established that the state court order becomes federalized insofar as federal, rather than state, procedure governs the manner of its enforcement as well as supplies whatever policy justification that might support its continuance. *Granny Goose Foods,* 415 U.S. at 438–41, 94 S.Ct. at 1123–25; *see also Azzopardi v. Ocean Drilling & Exploration Co.,* 742 F.2d 890, 895 (5th Cir. 1984). To the extent the state court order requires the parties to act or refrain from acting in a manner inconsistent with federal procedural requirements, the district court must accommodate the order to federal law. *Granny Goose Foods,* 415 U.S.

at 439–41 & n. 15, 94 S.Ct. at 1124–25 & n. 15.[2]

In sum, whenever a case is removed, interlocutory state court orders are transformed by operation of 28 U.S.C. § 1450 into orders of the federal district court to which the action is removed. The district court is thereupon free to treat the order as it would any such interlocutory order it might itself have entered.

■ If, for example, it appears that the state court imposed sanctions inconsistent with federal standards, the federal court should not be fettered by considerations of deference from independently developing the record and then modifying or dissolving the order, as the circumstances may require. Conversely, however, the policy of judicial economy promoted in *Granny Goose Foods* mitigates against our imposing an obligation on the district courts to conduct a determination *de novo* of the propriety of state court sanctions carried with the case upon removal to federal court, every time such an order is contested. The district court is perfectly free to adopt the state court record as the basis for sustaining a challenged state court order, as was done by the court below.

■ In the present case, moreover, the district court was under no affirmative obligation to harmonize the magnitude of the sanction imposed with the panoply of sanctions available for the same abuse under federal procedure; Fed.R.Civ.P. 37(b)(2) specifically authorizes a federal court to strike out the pleadings of a party who refuses to comply with its discovery orders.[3] Thus, the scope of our review is limited to determining whether this choice of sanctions—a choice the district court adopted by operation of 28 U.S.C. § 1450—constitutes an abuse of discretion under federal Rule 37 jurisprudence.

■ The discretion of a federal district court to impose sanctions under Rule 37(b)(2) is "broad but not unlimited." *Emerick v. Fenick Industries, Inc.*, 539 F.2d 1379, 1381 (5th Cir.1976). We have repeatedly emphasized that a dismissal with prejudice is a "draconian" remedy, or a "remedy of the last resort," to be employed only when the failure to comply with the court's order results from wilfullness or bad faith rather than from an inability to comply.[4] Nevertheless, deliberate, repeated refusals to obey discovery orders have been held to warrant the use of this ultimate sanction. *See, e.g., Sciambra, supra; Kabbe, supra; Bonaventure v. Butler*, 593 F.2d 625, 626 (5th Cir.1979). We are further mindful that "[i]t is not our responsibility as a reviewing court to say whether we would have chosen a more moderate sanction. It is our responsibility solely to decide whether the district court could, in its discretion, have determined the appellant's conduct to be so flagrant as to

---

**2.** In *Granny Goose Foods,* the Supreme Court confronted the question of the effect of 28 U.S.C. § 1450 on a temporary restraining order (TRO) issued in California state court prior to removal. The Supreme Court held, first of all, that since the order does not obtain any greater effect than it would have had if the case had remained in state court, the order would lapse in time, just as it would in state court, without the federal court's affirmatively taking any formal action to dissolve it. 415 U.S. at 433–36, 94 S.Ct. at 1121–23. The Court next held that in no event would the order remain in force longer than the time limitations imposed by Fed.R.Civ. P. 65(b) on federal TRO's, measured from the date of removal. Thus, although the California TRO would have remained in effect in state court for 13 days beyond the date of removal, the 10–day time limitation of Rule 65(b) caused the order to lapse in federal court on the tenth day after removal. 415 U.S. at 439–41, 94 S.Ct. at 1124–25.

**3.** Fed.R.Civ.P. 37(b)(2)(C) provides in pertinent part:

If a party ... fails to obey an order to provide or permit discovery ... the court in which the action is pending may make such orders in regard to the failure as are just, and among others the following: [a]n order striking out the pleadings or parts thereof....

**4.** *See, e.g., Sciambra v. Graham News Co.*, 841 F.2d 651, 655 (default judgment pursuant to Rule 37 affirmed for failure to produce documents) (5th Cir.1988); *Batson v. Neal Speloe Associates, Inc.*, 765 F.2d 511, 516 (5th Cir.1985) (citing *National Hockey League v. Metro Hockey Club, Inc.*, 427 U.S. 639, 640, 96 S.Ct. 2778, 2779, 49 L.Ed.2d 747 (1976)); *Kabbe v. Rotan Mosle, Inc.*, 752 F.2d 1083, 1084 (5th Cir.1985).

justify striking its pleadings." *Emerick,* 539 F.2d at 1381.

The record shows that Kline deliberately and repeatedly violated state court orders requiring her to produce subpoenaed documents and answer questions relating to the whereabouts of the Pemex check funds.[5] When her deposition was noticed for May 8, 1981, she moved for a protective order, which the state court denied and ordered her to appear for her deposition and to produce the subpoenaed documents. On May 8, Kline appeared as ordered, but neither produced the requested documents nor answered Nissho's questions about the check funds.

In September 1981, the state court ordered Kline to appear before a court reporter on October 8, to answer thirty-four questions she had refused to answer during her deposition and to produce certain enumerated documents that had been withheld. On October 8, Kline neither appeared nor offered any explanation for her failure to do so, prompting Nissho to move for entry of a default judgment against her.[6] The state court thereupon issued an order requiring Kline to appear and show cause why she should not be sanctioned.

On October 19, 1981, Nissho's motion was heard. Kline was not present because she was allegedly in Mexico on business, and her attorneys in the meantime had moved for a continuance. The state court decided to carry Nissho's motion until yet a later date, once again ordering Kline to appear for her deposition and produce certain documents, scheduled to occur on November 2.

Kline did not appear for this court-ordered deposition. Nor did her attorneys notify opposing counsel of her "inability" to attend.[7] Kline's counsel merely proffered *unsworn* answers to the thirty-four questions she had been ordered to answer. The requested documents were not included. On November 30, the state court held the show cause hearing and determined that Kline's pleadings should be stricken. We find no abuse of discretion.

## III.

Our need to reach the substantive merit of appellants' counterclaims and defenses is obviated for another reason: appellants' failure to resist Nissho's motion for partial summary judgment with competent summary judgment evidence. At the time the court below ruled on Nissho's motion, the only evidence in the summary judgment record purporting to justify Kline's appropriation of the Pemex check funds was her own rendition of facts contained in a notarized, self-described "affidavit."[8] This affidavit is neither sworn nor its contents stated to be true and correct

---

5. As noted in oral argument, Nissho was seriously prejudiced by Kline's failure to comply. Contemporaneously with its discovery requests, Nissho had filed for a mandatory injunction to place the check proceeds into the court's registry under a constructive trust theory. Kline was able to block issuance of the injunction so long as Nissho could not inform the court of the money's location.

6. Kline maintained throughout this case that she had no knowledge of the state court's order requiring her to appear on October 8. This position was undermined, however, by the presence of a letter written on her behalf by a Mexican official in September stating that she could not appear on that date because she was to have an audience with the President of Mexico. We thus find no abuse of discretion in the state court's disregarding this explanation.

7. Kline contends that she was unable to attend the November 2 deposition because of illness.

However, Kline's own medical expert conceded at the show cause hearing that, although unable to travel, Kline was well enough to be deposed in New York. No offer was made at the hearing by Kline's counsel to submit to further deposition in New York.

8. Essentially, Kline's version is that the Aston group conspired from the start to displace her in her business relationship with Pemex. Nissho is alleged to have agreed orally with Kline to supply pipe to fill an additional $20 million worth of Pemex purchase orders, and then to have joined in the Aston group's conspiracy. When Kline became apprised of what was afoot, she appropriated the check funds to protect her entitlement to a commission under the original Pemex purchase order, and to compensate her for damages caused by Nissho's repudiation of its alleged oral agreement with her. Once again, we offer no opinion as to the substantive merit of these facts as a defense to Nissho's cause of action.

nor stated under penalty of perjury.[9]

Nissho duly objected to these defects, thereby giving Kline an opportunity to move for leave to file a corrected affidavit or to respond as to why her unsworn statement should be considered competent for raising issues of material fact. Kline made no response. Only now on appeal does she characterize Nissho's objection "hypertechnical" and offer the drafting attorney's affidavit as evidence that the jurat in Kline's affidavit was not intended to avoid exposing her to the penalties of perjury, as Nissho claims.[10]

It is a settled rule in this circuit that an unsworn affidavit is incompetent to raise a fact issue precluding summary judgment.[11] A statutory exception to this rule exists under 28 U.S.C. § 1746, which permits unsworn declarations to substitute for an affiant's oath if the statement contained therein is made "under penalty of perjury" and verified as "true and correct."[12] Kline's affidavit is not in substantial conformity with either formula because, as drafted, it allows the affiant to circumvent the penalties for perjury in signing onto intentional falsehoods. Kline never declared her statement to be true and correct; therefore, her affidavit must be disregarded as summary judgment proof. See also Flowers v. Abex Corp., 580 F.Supp. 1230, 1233 n. 2 (N.D.Ill. 1984) (merely notarizing signature does not

---

9. The acknowledgement at the end of the purported affidavit reads as follows:
THE STATE OF TEXAS
COUNTY OF HARRIS
BEFORE ME, the undersigned authority, on this day personally appeared Mrs. Rukmini Sukarno Kline, known to me to be the person whose name is subscribed to the foregoing Affidavit, and acknowledged to me that she executed the same for the purposes and consideration therein expressed.
/s/ Rukmini Sukarno Kline
RUKMINI SUKARNO KLINE
GIVEN UNDER MY HAND AND SEAL OF OFFICE this 17th day of April, 1983.
/s/ Robert C. Bennett, Jr.
Notary Public in and for
Harris County, Texas

10. Nissho's theory is that Kline and her attorneys intentionally avoided subjecting her, in her "affidavit," to the penalties of perjury for a false affidavit, which would have caused complications for her in a related criminal proceeding. In fact, at the time she tendered her "affidavit," she had been indicted for taking the proceeds of the Pemex check. She was convicted and sentenced to fourteen years in prison. See Kline v. State, 737 S.W.2d 895 (Tex.App.—Houston [1 Dist.] 1987, pet. ref'd). Kline's attorney on appeal in the criminal proceeding was the person who notarized her "affidavit" in the court below.
Shortly before oral argument, Kline tendered to this court an affidavit (in proper form) executed by an attorney with another firm, who formerly represented Kline in the instant civil matter, which affidavit asserted that he prepared the faulty instrument and that it was not intentionally designed to avoid the penalties of perjury. Counsel apparently was on the horns of a dilemma: He had either prepared a flawed affidavit that might otherwise (but for the striking of her pleadings) have protected his client from an adverse summary judgment, or he had contrived a document intended to allow his

client to establish summary judgment proof without the perjury exposure for false statements that is contemplated by the federal rules. As noted above, Kline's attorneys failed to correct the defect even after Nissho pointed it out in its summary judgment pleadings.

11. See e.g., Martin v. John W. Stone Oil Distributor, Inc., 819 F.2d 547, 549 (5th Cir.1987); Meserole v. M/V Fina Belgique, 736 F.2d 147, 148 (5th Cir.1984); Gordon v. Watson, 622 F.2d 120, 123 (5th Cir.1980); Jones v. Menard, 559 F.2d 1282, 1285 n. 4 (5th Cir.1977).

12. 28 U.S.C. § 1746 provides:
Wherever, under any law of the United States or under any rule, regulation, order, or requirement made pursuant to law, any matter is required or permitted to be supported, evidenced, established, or proved by the sworn declaration, verification, certificate, statement, oath, or affidavit, in writing of the person making the same (other than a deposition, or an oath of office, or an oath required to be taken before a specified official other than a notary public), such matter may, with like force and effect, be supported, evidenced, established, or proved by the unsworn declaration, certificate, verification, or statement, in writing of such person which is subscribed by him, as true under penalty of perjury, and dated, in substantially the following form:
(1) If executed without the United States: "I declare (or certify, verify, or state) under penalty of perjury under the laws of the United States of America that the foregoing is true and correct. Executed on (date).
(Signature)".
(2) If executed within the United States, its territories, possessions, or commonwealths: "I declare (or certify, verify, or state) under penalty of perjury that the foregoing is true and correct. Executed on (date).
(Signature)".

transform document into affidavit that may be used for summary judgment purposes).

Kline maintains that even if her affidavit cannot be considered, her deposition testimony unquestionably asserts in an appropriate manner the identical position she takes in her affidavit. Her assumption—which we note to be incorrect—is that the entire record in the case must be searched and found bereft of a genuine issue of material fact before summary judgment may be properly entered.

To the contrary, Fed.R.Civ.P. 56(e) "requires ... the nonmoving party to go beyond the pleadings and by her own affidavits, or by the 'depositions, answers to interrogatories, and admissions on file,' *designate* 'specific facts showing that there is a genuine issue for trial.'" *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 2553, 91 L.Ed.2d 265 (1986) (quoting Fed.R.Civ.P. 56(e)) (emphasis added). In her response to Nissho's motion, Kline designates no specific facts to which she testifies in her first deposition—her only deposition of record at the time the court below ruled on Nissho's motion—that would support her version of this case. We cannot consider her second deposition, or for that matter, the drafting attorney's affidavit, because our review is confined to an examination of materials before the lower court at the time the ruling was made; subsequent materials are irrelevant. *Ingalls Iron Works Co. v. Fruehauf Corp.*, 518 F.2d 966, 967 (5th Cir.1975); 10 C. Wright, A. Miller & M. Kane, *Federal Practice and Procedure: Civil* 2d § 2716 (1983).

IV.

For the foregoing reasons, the judgment entered by the district court is AFFIRMED.

*ON PETITION FOR REHEARING*
PER CURIAM:

IT IS ORDERED that the petiton for rehearing filed in the above entitled and numbered cause be and the same is hereby DENIED. The petition for rehearing asserts that the second Kline deposition was made part of the record. Even assuming that that deposition was of record at the time the

district court granted partial summary judgment, Kline still failed to designate, or in any way refer to, the deposition as the source of factual support for her response to Nissho's motion. Thus, the deposition was never made part of the competent summary judgment record before the district court.